UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FAIR VIEW SERVICE STATION, INC. derivatively for the benefit of and on behalf of Nominal Defendant DORAL FINANCIAL CORPORATION, | ) ) ) ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) |
| GLEN R. WAKEMAN, DENNIS G. BUCHERT, JAMES E. GILLERAN, DOUGLAS L. JACOBS, DAVID E. KING, and GERALD L. SMITH, INSURANCE CO. A, INSURANCE CO. B, INSURANCE CO. C | ) ) ) ) ) |
| | ) |
| Defendants, | ) |
| | ) |
| and | ) |
| | ) |
| DORAL FINANCIAL CORPORATION., a Puerto Rico Corporation, | ) ) |
| | ) |
| Nominal Defendant. | ) |
| | ) |
| | ) |
| | ) |

CIVIL ACTION No. 14-cv-001326

JURY TRIAL DEMANDED

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

Plaintiff Fair View Service Station, Inc. ("Fairview") represented by its Vice President and General Manager Miguel A. Rivera, duly authorized by Corporate Resolution by and through the undersigned attorneys, derivatively on behalf of Doral Financial Corporation. ("Doral" or the "Company"), alleges as follows, upon personal knowledge as to it and its own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through its attorneys, which included, among other things, a review and analysis of Doral's public filings with the U.S. Securities and Exchange Commission ("SEC"), the Federal Reserve System, Federal Deposit Insurance Corporation ("FDIC"), news reports, press releases, and other publicly available sources.

## NATURE OF ACTION

1.      This is a shareholder derivative action brought by Plaintiff, a stockholder of record of Doral, on behalf of Nominal Defendant Doral, and all Doral shareholders against certain current and former members of the Company's Board of Directors (identified below as the "Individual Defendants"). This derivative action arises from the Individual Defendants' breaches of their fiduciary duties of loyalty, candor and good faith and abuse of their control of Doral in connection with their causing, approving, and/or acquiescing in: (1) Doral's issuance of false and misleading financial reports and financial statements filed with the SEC that violated Generally Accepted Accounting Principles ("GAAP") by admitting to material weakness in its internal control over financial reporting as of December 31, 2013. On March 18, 2014, Doral stated that the Company could not timely file its Form 10-K with the SEC and further admitted in its Form 12b-25 that its internal controls over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013. On March 21, 2014, the Company further stated that it had determined to revise its financial statements for the quarter ending September 30, 2013. The Company reported a restated net loss of $50.9 million for the quarter ending December 31, 2013. In addition to admitting material weakness in its internal controls, Doral's provision for loan losses for the quarter ended September 30, 2013 increased by $7.2 million, to $23.6 million. Additionally, Doral admitted that

its net loss attributable to common shareholders increased from $1.49 per share to $2.57 per share outstanding.

2.      Doral's largest subsidiary, Doral Bank, whose board contains a majority of the Doral Board, had previously executed and entered into a Stipulation and Consent Order with the FDIC dated August 8, 2012 (the "Consent Order").  Doral itself had also entered into a written agreement with the Federal Reserve Bank of New York (the "Reserve Bank") dated September 11, 2012 (the "Written Agreement") relating to Doral's mortgage-related activities, which replaced and superseded a previous Cease and Desist Order with the Board of Governors of the Federal Reserve System.  The Written Agreement, which was entered by the Company and executed by Defendant Wakeman, requires Doral to implement certain plans to strengthen credit risk management policies for loans held by the Company, standards for assessing credit quality of loans, monthly reporting to the Board of Directors, and additionally requiring improvement in overseeing Doral's loan grades, trends in asset quality, nonperforming loans, and strengthening the quality of the Company's loans.

3.      Further, the Written Agreement requires the Company to eliminate assets qualified as "loss" and establish an allowance for loan and lease losses ("ALLL") methodology for loans held by Doral consistent with supervisory guidance.  Moreover, the Company is to submit a quarterly written report regarding the Board of Directors' quarterly review of ALLL and a description of any changes to the methodology used for determining the amount of ALLL.

4.      The Written Agreement also requires the Company to submit acceptable written accounting and internal control policies and procedures, including reporting procedures to ensure that management and the Board of Directors and its committees receive timely, informative and accurate reports necessary to effectively manage risk, correct weaknesses and deficiencies associated with accounting and financial reporting.

5.      The Consent Order likewise requires the board of Doral Bank (the "Bank Board") to increase its oversight of the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives.  The Bank Board is required to hold monthly meetings to review areas including nonaccrual, nonperforming, classified and recovered loans, adoption of operating policies,

audit reports, internal control reviews.  The Company is required to document these reviews and approvals in the Bank Board's minutes.  The Consent Order specifically requires the Bank to develop a comprehensive policy and methodology for determining allowance for loan and lease losses and which was to be reviewed by the Bank Board and reported in the quarterly Consolidated Reports of Condition and Income.

6.     Despite the Board's requirement to establish policies and actively monitor the Company's financial reporting and ALLL as set forth in the Written Agreement and as reinforced in the Consent Order, on March 18, 2014, the Company surprised investors by announcing that it could not timely file its Form 10-K for the year ending December 31, 2013 due to the fact that the Company had discovered a material weakness in its internal controls over financial reporting and disclosure controls and that such controls were ineffective as of December 31, 2013.

7.     The Company, which has been under intense regulatory oversight as a result of its prior admitted lack of internal accounting controls, faces further injury, both economically and to its reputation, as a result of Defendants' breaches of their fiduciary duties to the Company.  As a result of Defendants' breaches, Doral has continued to suffer millions of dollars in losses due to the Board's insufficient accounting oversight.  Moreover, and as a result of Defendants' actions, Doral stock has lost approximately 20% of its value, erasing tens of millions of dollars in shareholder equity.

8.     Given the existing mandate of the Consent Order and Written Agreement, the Individual Defendants breached their fiduciary duties to the Company and acted recklessly or with gross negligence by allowing Doral to file false financial statements and maintain insufficient internal controls.  Defendants further failed to adequately monitor and oversee the Company's accounting and internal controls.  Indeed, in light of the prior accounting issues described in the Consent Order and Written Agreement, including the Company's admitted lack of internal controls, Defendants failed to perform the appropriate due diligence to prevent Doral from engaging in further violations of accounting laws and to incur further harm from the admitted material weakness in internal controls.

9.      This action seeks redress for the Individual Defendants' collective and individual breaches of their fiduciary duties of loyalty, good faith and candor, and their knowing, reckless and/or gross negligence in, *inter alia*: (i) allowing the Company to file false and misleading financial statements; (ii) failing to properly implement, oversee and maintain appropriate and adequate accounting and business ethics, internal controls, practices and procedures; and (iii) harming the value of the Company by the wrongful conduct engaged in by Defendants.

10.     The Individual Defendants, in particular the Defendants who were on the Audit Committee and specifically Defendant Buchert who is designated as a financial expert of the Audit Committee for, among other things, his understanding of GAAP and internal controls over financial reporting, were on notice about GAAP regulations regarding accounting for ALLL and other treatment of loans and loan modifications.  Despite the existing Written Agreement and Consent Order, which Defendants were aware of, and which already explicitly highlighted specific issues relating to the lack of proper internal controls at the Company and its major subsidiary, the Individual Defendants ignored those facts and caused and/or allowed the Company to violate GAAP and expose the Company to significant losses and liabilities.

11.     Individual Defendants' malfeasance has caused, and will continue to cause, Doral and its shareholders great harm by: (i) indelibly damaging its reputation and goodwill in general; (ii) exposing the Company to potential criminal and civil liability; and (iii) having the Company absorb the financial losses as the common stock price fell from its artificially inflated prices to a considerably lower price because of a "liars' discount" and a skepticism of its business operations by the investing public as a direct result of the Defendants' unlawful, unethical, and deceptive manner of handling their accounting responsibilities.

## JURISDICTION

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 because Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

- 4 -

13.     Venue is proper in this Court because one or more of the Defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Doral occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### A.     Plaintiff

14.     Plaintiff Fair View Service Station, Inc. is and was a shareholder of nominal defendant Doral at relevant times.  Plaintiff is a registered corporation in good standing in Puerto Rico with the registration number 65,549 at the Commonwealth of Puerto Rico Department of State since February 2nd, 1987, and resident and citizen of San Juan, PR

### B.     Nominal Defendant

15.     Nominal Defendant Doral Financial Corporation, Inc. is a Puerto Rico corporation with its principal executive offices located at 1451 Franklin D. Roosevelt Avenue, San Juan, Puerto Rico 00920.  According to Doral's filings with the SEC, Doral Financial Corporation was organized in 1972 under the laws of the Commonwealth of Puerto Rico and operates as a bank holding company. Doral Financial's principal operations are conducted in Puerto Rico, with growing operations in the United States, specifically in the New York City metropolitan area, as well as in northwest and south Florida.  Doral Financial has four wholly-owned subsidiaries: Doral Bank ("Doral Bank"), Doral Insurance  Agency, LLC ("Doral Insurance Agency"), Doral Recovery, Inc. ("Doral Recovery I"), and Doral Properties, Inc. ("Doral Properties").  The Company has over 6.6 million shares of common stock issued and outstanding which trade on the New York Stock Exchange under the ticker symbol "DRL."

### C.     Individual Defendants

16.     Defendant Glen R. Wakeman ("Wakeman") has served as President, Chief Executive Officer and member of the Board of Directors of Doral since August 2006.  Wakeman has served as

the President of Doral Bank since October 2008. Wakeman previously served as President and Chief Operating Officer of Doral from May 2006 to August 2006. Wakeman is a citizen of Florida.

17.     Defendant Dennis G. Buchert ("Buchert") is the Chairman of the Board and has served as Director of Doral since October 2006. Buchert was Chairman of the Board of Doral from January 2007 to July 2007. Buchert is a citizen of New York.

18.     Defendant James E. Gilleran ("Gilleran") has served as a director of Doral since December 2007. Gilleran has been Management Consultant of the Company since May 2007. Gilleran is a citizen of Washington State.

19.     Defendant Douglas L. Jacobs ("Jacobs") has served as a director of Doral since February 2009. Jacobs is a citizen of New York.

20.     Defendant David E. King ("King") has served as director of Doral since July 2007. King is a citizen of New York.

21.     Defendant Gerard L. Smith ("Smith") has served as a director of Doral since June 2008. Smith is a citizen of New York.

22.     Defendants Wakeman, Buchert, Gilleran, Jacobs, King, and Smith are collectively referred to herein as "Defendants" or "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

### A.     Defendants' Prior Accounting Issues and Ongoing Responsibilities to Maintain Adequate Internal Controls

23.     Defendants have a recent track record of disregarding their duty to maintain adequate systems of internal controls and to ensure that the Company is run in a lawful manner. Many of the Defendants were members of the Board during the time when the Company engaged in or resolved the issues identified in the Consent Order and the Written Agreement. The systematic flaunting of corporate responsibilities has resulted in at least one civil whistleblower action, multiple regulatory actions and culminated in two binding orders against Doral and its largest subsidiary, Doral Bank,

which underscore and amplify not only the Individual Defendants' past failures, but their existing obligations to run Doral in a lawful and competent fashion.

24.      According to a lawsuit filed by Doral's former Principal Accounting Officer under the whistleblower protection provisions of the Sarbanes-Oxley Act of 2002, the lack of respect for the Company's legal and ethical obligations and for obedience to the regulatory framework came from the very top of the Company.

25.      Ronald Stewart ("Stewart") was retained by Doral as a Senior Vice-President and Principal Accounting Officer on September 7, 2011.[1]  In this capacity, Stewart reported directly to the CFO of Doral.  On February 16, 2012, Stewart sent a letter to the Chairman of Doral's Audit Committee expressing concerns regarding "deficiencies in the Bank's program of internal controls as required by Sarbanes-Oxley."  Stewart was concerned that because of "comments, the indicated environment, and other observed internal control weaknesses," that potential deficiencies in Doral's system of internal controls "could potentially rise to the level of a material weakness and go unreported."

26.      Stewart alleges that Defendant Wakeman directed him and others to distort the Company's financial reports, stating that Wakeman commented as follows: "I want our leverage ratio over 9% even if that means booking assets in later periods."  Stewart included a second comment by Defendant Wakeman: "I don't care about the Regulators.  I will do whatever it takes to make this deal work and if it means going against the Regulators that's a risk I will take .... the Regulators will not tell me what I can or cannot do when I am trying to increase the Bank's capital by $200MM."  Stewart was concerned that such comments indicated an environment which could result in employees responsible for internal controls feeling pressure to misrepresent the

---

[1]  All factual allegations regarding Mr. Stewart are taken from the complaint filed in *Stewart v. Doral Financial Corporation*, 13-cv-01349-DRD (D.P.R. May 6, 2013).

performance of internal controls, which could in turn lead to misstatements of the financial condition of Doral.

27.      Stewart further alleged that Wakeman constantly undermined the credibility of Doral's CFO, and that the relationship between Wakeman and the CFO adversely impacted the ability of the internal control system of Doral to ensure accurate financial reporting.

28.      Stewart also expressed concerned in his letter to the Chairman of the Audit Committee about a corporate initiative known as "Role Clarity" which was aimed at reducing costs and personnel, but without giving consideration to internal controls when personnel decisions were made, or to the transition of internal control responsibilities when personnel change was involved.

29.      Stewart concluded that the above issues combined to put the Company at risk of non-compliance with the legal duty under Sarbanes-Oxley to accurately report financial information and/or report material weaknesses in the Company's internal control program in public filings.

30.      Stewart alleges that he was terminated on March 15, 2012, less than one month after sending his letter to the Chairman of the Audit Committee of Doral, and that the termination was in retaliation for the letter.  Stewart filed a whistleblower complaint under Sarbanes-Oxley on May 6, 2013.  Motions to dismiss filed by Doral were denied by an order dated February 21, 2014.[2]

31.      On August 8, 2012, Doral Bank entered into the Consent Order as part of the FDIC's investigation into Doral.  Much of the Consent Order is directed specifically at the board of Doral Bank (the "Bank Board").  Four defendants in this action – Gilleran, Buchert, Jacobs and Wakeman – concurrently serve on the Bank Board, and thus are bound by, and should be familiar with, its terms.  The Consent Order contained, *inter alia*, the following provisions (note that all emphasis is added unless otherwise stated):

BOARD PARTICIPATION

---

[2] *See Stewart v. Doral Financial Corp.*, 2014 WL 661587 (D.P.R. February 21, 2014).

1. (a) ***The Board shall increase its oversight of the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives and for the oversight of all of the Bank's activities***, consistent with the role and expertise commonly expected for directors of banks of comparable size.

(b) This oversight shall include meetings to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: reports of income and expenses; to the extent appropriate, new, overdue, renewal, insider, charged off, delinquent (30 to 89 days), nonaccrual, nonperforming, classified and recovered loans; investment activity; internal loan watch; liquidity levels and funds management; adoption or modification of operating policies; individual committee reports; audit reports; ***internal control reviews including managements' responses***; reconciliation of general ledger accounts; and compliance with this ORDER. Board minutes shall document these reviews and approvals, including the names of any dissenting directors.

## MANAGEMENT

2. (a) The Bank shall have and retain qualified management. At a minimum, such management shall include: a chief executive officer with proven ability in managing a bank of comparable size and complexity and experience in upgrading a low quality loan portfolio; a senior lending officer with an appropriate level of lending, collection, and loan supervision experience for the type and quality of the Bank's loan portfolio; and a chief financial officer with demonstrated ability in all financial areas including, but not limited to, accounting, regulatory reporting, budgeting and planning, management of the investment function, liquidity management, and interest rate risk management. The Board shall provide the necessary written authority to management to implement the provisions of this ORDER.

(b) The qualifications of management shall be assessed on its ability to: (i) comply with the requirements of this ORDER; (ii) operate the Bank in a safe and sound manner; (iii) comply with applicable laws, rules, and regulations; and (iv) restore all aspects of the Bank to a safe and sound condition, including capital adequacy, asset quality, management effectiveness, earnings, liquidity, and sensitivity to interest rate risk

(c) Within 45 days from the effective date of this ORDER, the Bank shall retain a third-party bank consultant who is acceptable to the Regional Director and the Commissioner who will develop a written analysis and assessment of the Bank's Board and management needs ("Management Report") for the purpose of ensuring appropriate Board oversight and providing qualified management for the Bank.

* * *

(f) The Management Report shall be developed within 60 days from the date the Regional Director and the Commissioner issue a letter of non-objection to the engagement of the third-party bank consultant and shall include, at a minimum: (i) identification of both the type and number of Board and senior executive officer positions needed to properly oversee the Bank's management and supervise the affairs of the Bank, respectively; (ii) identification and establishment of such Board and management committees as are needed to provide guidance and oversight to the Bank's management; (iii) evaluation of all Board members and senior executive officers to determine whether these individuals possess the ability, experience and other qualifications required to perform present and anticipated duties, including adherence to the Bank's established policies and practices, and restoration and maintenance of the Bank in a safe and sound condition; (iv) evaluation of the compensation of all of the officers senior executive officers and directors of the Bank, including salaries, director fees, and other benefits; (v) evaluation of the reasons for the excessive turnover in officer/senior executive officer positions at the Bank since 2006; and (vi) a plan to recruit and hire any additional or replacement personnel with the requisite ability, experience and other qualifications to fill any director or officer senior executive officer positions identified in the Management Report.

(g) Within 30 days from receipt of the Management Report, the Bank shall formulate a written plan ("Management Plan") that incorporates the findings of the Management Report, a plan of action in response to each recommendation contained in the Management Report, and a time frame for completing each action.

(h) At a minimum, the Management Plan shall: (i) contain a recitation of the recommendations included in the Management Report, a plan of action to respond to each recommendation, and a time frame for completing each action; (ii) include provisions to implement necessary training and development for the Bank's management; (iii) establish procedures to periodically review and update the Management Plan, as well as periodically review and assess the performance of each senior executive officer; and (iv) contain a current management succession plan.

(i) The Management Plan shall be submitted to the Regional Director and the Commissioner for non-objection or comment. Within 30 days from receipt of non-objection or any comments from the Regional Director and the Commissioner, and after incorporation and adoption of all comments, the Board shall approve the Management Plan, which approval shall be recorded in the minutes of the Board meeting. Thereafter, the Bank shall implement and fully comply with the Management Plan

32.      The Consent Order contained multiple further specific directives to Doral Bank and the Bank Board, relating to, among other things, proper treatment of loss charge-offs; reduction of delinquencies and classified assets; development of a written capital plan; allowance for loan and lease losses ("ALLL"); a review of bank loan policies and procedures, including a review of the

bank's loan portfolio and modification programs; an appraisal compliance program revision; a strategic plan; and creation of a compliance committee.  Doral Bank was further prohibited from paying dividends without prior permission, and was required to submit quarterly progress reports.

33.      As stated above, a majority of the Board concurrently sits on the Bank Board. Defendants Gilleran, Buchert, Jacobs and Wakeman, as members of the Bank Board are thus bound by the terms of the Consent Order.  The remainder of the Board was well aware of the Consent Order and indeed, the entire Board has an ongoing duty to ensure that Doral Bank – the largest segment of Doral – is run soundly and in accordance with the provisions of the Consent Order.

34.      On September 11, 2012, Doral entered into the Written Agreement with the Reserve Bank, its primary supervising regulator.  The Written Agreement replaces and supersedes a Cease and Desist Order entered into between Doral and the Board of Governors of the Federal Reserve System on March 16, 2006.

35.      The Written Agreement was necessitated by "deficiencies at Doral relating to Doral's credit risk management and credit administration practices," and was authorized by the entire Board, who thereby consented to comply with each of its provisions.

36.      The Written Agreement requires that the Board:

> (a) take appropriate steps to fully utilize its financial and managerial resources to serve as a source of strength to Doral Bank, including steps to ensure that Doral Bank complies with any supervisory action taken by Doral Bank's federal and state regulators;
>
> (b) undertake a management and staffing review to aid in the development of a suitable management structure that is adequately staffed by qualified and trained personnel;
>
> (c) *establish programs, policies and procedures acceptable to the Federal Reserve relating to credit risk management practices, credit administration, loan grading, asset improvement, other real estate owned ("OREO"), the allowance for loan and lease losses ("ALLL"), accounting and internal controls, and internal audit*;
>
> (d) not declare any dividends without the prior written approval of the Federal Reserve and the Director of Banking Supervision and Regulation of the Board of Governors;

(e) not directly or indirectly take any dividends or any other form of payment representing a reduction of capital from Doral Bank without the prior approval of the Federal Reserve;

(f) not, directly or indirectly, incur, increase or guarantee any debt without the prior written approval of the Federal Reserve;

(g) submit to the Federal Reserve an acceptable written plan (and any updates) to maintain sufficient capital at the Company on a consolidated basis; and

(h) seek regulatory approval prior to the appointment of a new director or senior executive officer, any change in a senior executive officer's responsibilities, or making certain severance or indemnification payments to directors, executive officers or other affiliated persons.

37.     The Written Agreement further requires Doral to submit quarterly progress reports to the Federal Reserve.  As with the Consent Order, the Written Agreement serves to highlight and deepen the already stringent duties of the Board to run Doral faithfully and to establish internal controls sufficient to prevent the type of unlawful and shoddy practices that led to the Consent Order and the Written Agreement.

38.     Each of the Defendants was a member of the Board at the time that the Written Agreement was authorized and executed, and is personally subject to the applicable provisions thereof.

**Defendants' Failure to Maintain Adequate Internal Controls**

39.     On November 5, 2013, Doral filed a Form 10-Q with the SEC, reporting on the Company's third quarter 2013 results.  Among other financial results, the Company stated the following:

> Net loss for the three months ended September 30, 2013 totaled $7.5 million, compared to a net loss of $32.5 million for the comparable 2012 period. The Company's net loss decreased $25.1 million, due to a decrease of $18.0 million in the PLLL, a decrease of $5.1 million in non-interest expense, a decrease of $1.6 million in income tax expense and an increase of $1.4 million in net interest income, partially offset by a decrease in non-interest income of $1.0 million.

* * *

The provision for loan and lease losses for the three months ended September 30, 2013 was $16.4 million, reflecting a decrease of $18.0 million when compared to the $34.4 million provision for the corresponding 2012 period. The decrease in the PLLL is mostly related to: (i) enhancements in the assumptions of the model; and (ii) a decrease of $24.3 million in charge-offs recorded for the three months ended September 30, 2013 when compared to the same period in 2012.

40.    In a press release dated November 5, 2013, the Company reported its improving financial results, claiming in part:

Doral Financial reduced its net loss for the third quarter ended September 30, 2013 to $7.5 million. This compares to net losses of $10.4 million and $32.5 million for the second quarter ended June 30, 2013 and the year ago quarter ended September 30, 2012, respectively. Doral Financial's net loss attributable to common shareholders for the three months ended September 30, 2013 was $9.9 million. For the second quarter of 2013, the net loss attributable to common shareholders was $12.8 million and for the third quarter of 2012 the net loss attributable to common shareholders was $35.0 million.

Defendant Wakeman touted the success of Doral's strategy, stating:

**The third quarter demonstrated continued progress for Doral as we work towards building a profitable and stronger bank.** Our decision to divide operations into Doral Growth, a profitable mortgage and commercial bank, and Doral Recovery, a special servicing portfolio, have allowed us to weather the continued economic recession in Puerto Rico. We continue to take advantage of significant opportunities in our U.S. mainland operation and remain committed to creating affordable mortgage solutions for our customers and local communities in Puerto Rico.

41.    On March 18, 2014, Doral filed a Form 12b-25 with the SEC, serving as a notification that Doral would be unable to timely file its Form 10-K annual report. Doral stated the following in explaining the delay:

These delays were primarily a result of performing additional analyses and reviews of the Company's process for estimating its allowance for loan losses and evaluating the effectiveness of the Company's disclosure controls and procedures and changes in internal control over financial reporting. **The Company has concluded that it has a material weakness in its internal control over financial reporting as of December 31, 2013**, related to the review of the underlying data and mathematical model supporting its allowance for loan and lease losses and the related provision for loan and lease losses. As a result of the material weakness, **the Company has concluded that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013**. While the Company has implemented processes and controls to address this material weakness during the

fourth quarter, *management has determined that sufficient time has not passed to conclude that the weakness has been remediated*.

42.      In the same Form 12b-25, Doral released preliminary financial results for the year ending December 31, 2013.  The results showed a dramatic deterioration in the fiscal health of the Company over the previous year.  According to the Form 12b-25:

> The Company presently estimates that it will incur a net loss for the year ended December 31, 2013 of approximately $88.3 million, compared to a net loss of $3.3 million for the year ended December 31, 2012. Based on current estimates, when comparing 2013 results to 2012 results, the Company's performance variance resulted from the following: (i) an increase in net interest income of $5.7 million; (ii) a decrease of $102.5 million in the provision for loan and lease losses; (iii) a $12.8 million decrease in non-interest income; (iv) an increase of $18.3 million in non-interest expense; and (v) a decrease in income tax benefit of $162.0 million. These 2013 estimates are based on preliminary information and as such are subject to change as the Company continues to work on the preparation of its audited consolidated financial statements for the year ended December 31, 2013.

43.      Later in the same Form 12b-25, Doral announced that it had determined a need to restate its financial statements for the quarter ending September 30, 2013.  As a result of the restatement, Doral reported that its provision for loan losses for that quarter rose from the previously reported $16.4 million to $23.6 million – an increase of 44% – and that its net loss was $14.7 million, or $2.57 per share outstanding on a fully diluted basis as compared to the previously reported amounts of $7.5 million and $1.49.

44.      The admissions by Doral of a material weakness in, and ineffectiveness of its internal controls, along with the announcement of the restatement of its financial results for the third quarter of 2013, came barely 18 months after Doral entered into the Written Agreement with the Federal Reserve, which expressly charged the Board with monitoring its ALLL program, and with establishing effective accounting and internal controls.  The failure to do so is a clear breach of the Individual Defendants' fiduciary duties of good faith and oversight over the Company's financial reporting.

45.      In the wake of this shocking announcement, the price of Doral common stock plummeted.  After closing at $12.30 per share on March 17, 2014, the day before the filing of the Form 12b-25, Doral shares fell $1.13 – or 9% – the following day, and have continued to tumble,

- 14 -

reaching as low as $8.59 as of March 28, 2014 – an all-time low, and a decline of over 30% from pre-disclosure levels.   This drop represents a loss of tens of millions of dollars in market capitalization, immediately harming Doral's ability to raise capital cheaply.  Doral has also suffered reputational damage as a result of these events.

**B.    The Individual Defendants' General Duties and Obligations**

46.    By reason of their positions as officers, and/or directors of Doral and because of their ability to control the business and corporate affairs of Doral, the Individual Defendants owed Doral and its shareholders fiduciary obligations of care, candor, compliance, fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage Doral in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of Doral and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

47.    Each director and officer of the Company owes to Doral the fiduciary duty to comply with the laws of Puerto Rico and the United States and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

48.    For example, the Company, in its 2013 Proxy Statement, specifically stated that the Board of Directors is involved in the oversight of the company's accounting and internal controls:

> **Our Board of Directors has a significant role in the risk oversight of the Company**. Our Board of Directors considers effective risk management a fundamental part of good management practice and is committed to maintaining sound risk management systems. As mentioned above, our Board of Directors has a risk policy committee that is directly responsible for assisting the Board of Directors in discharging its responsibilities relating to enterprise risk management and monitoring the development and implementation of enterprise risk management strategies throughout the organization. Among other things, the risk policy committee is responsible for assisting the Board of Directors in fulfilling its oversight of the strategies, policies, procedures and systems established by the Company's management relating to the management of interest rate risk, market risk, liquidity risk, operational risk, compliance and legal risk and credit risk as well as overseeing hedging and derivatives activities. The risk policy committee also regularly participates in the review and approval of the Company's allowance for loan losses.

In order to carry out its responsibilities, the risk policy committee meets with management to assess the major risks of the Company. After its meetings, the risk policy committee reports to our Board of Directors in full.

49.      In its Form 10-K, filed belatedly with the SEC on March 21, 2014, the Company claimed the following progress and compliance with the Written Agreement and the Consent Order:

As of December 31, 2013, the Company has taken each of the following actions to comply with each main component of the Written Agreement:

(a) The Company has expanded its managerial resources as a source of strength to Doral Bank by hiring a new Chief Financial Officer ("CFO") to succeed the Interim CFO, who was appointed following the resignation of its prior CFO, and other persons in its financial staff. In addition, the Company hired a new Executive Vice President, Head of Puerto Rico Operations for the Company and Doral Bank, who was also appointed to serve as an executive director on the Board of Directors of Doral Bank (the "Bank Board") effective in January 2013. The Company also hired a new Chief Risk and Administrative Officer for Doral Recovery effective August 2013. The Company's Board of Directors (the "Board") also appointed two PR-based individuals to serve as independent directors on the Bank Board effective February 2013. Finally, the Company's Board meets at least quarterly to review the Company's ongoing compliance with the Written Agreement and formed a regulatory committee that meets at least quarterly to closely monitor the Company's compliance with the Written Agreement and Doral Bank's compliance with the Consent Order.

* * *

The Company further represented that it had established certain policies and procedures to address ALLL including an ALLL program to improve the methodology by which the ALLL is determined, which was reviewed by an independent third party; a capital plan; and a cash flow plan. As of December 31, 2013, most recommendations for further enhancement to the ALLL methodology developed during the independent third party review have been adopted and implemented.

50.      In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, so that the market price of the Company's stock would be based on truthful and accurate information.   Individual Defendants also had an obligation not to entrench themselves as officers and/or directors of the Company, to allow open and honest board elections

and to not advance their own personal, financial or economic interests over, and at the expense of, the Company's public shareholders.

51.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Doral, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Doral, each of the Individual Defendants had access to all non-public information about the financial condition, operations and future business prospects of Doral, including, without limitation, the illegal and improper activities which the Individual Defendants caused Doral to engage in.

52.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

53.    To discharge their duties, Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial and operational affairs of Doral.  By virtue of such duties, Defendants were required to, among other things:

(a)    manage, conduct, supervise and direct the business and internal affairs of Doral in accordance with the laws and regulations of Puerto Rico, the United States, and pursuant to the charter and bylaws of Doral;

(b)    neither violate, nor knowingly permit any officer, director or employee of Doral to violate applicable laws, rules and regulations;

(c)    remain informed as to the status of Doral's operations, and upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Doral and procedures for the reporting of the business and internal

affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)     maintain and implement an adequate and functioning system of internal legal, financial and management controls, such that Doral's operations would comply with all laws, Doral's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to Doral shareholders in Annual Reports would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f)     exercise reasonable control and supervision over the public statements to the securities markets, investors and public shareholders of Doral by the officers and employees of Doral and any other reports or other information required by law from Doral and to examine and evaluate any reports of examinations, audits or other financial information concerning the financial affairs of Doral and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

54.     During all times relevant hereto, each of the Individual Defendants occupied positions with Doral or was associated with the Company in such a manner as to make him or her privy to confidential and proprietary information concerning Doral, its operations, finances and financial condition.  Because of these positions and such access, each of the Individual Defendants knew that the true relevant facts specified herein had not been disclosed to and were concealed from Doral's shareholders.  The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material information regarding Doral and to take any and all actions necessary to ensure that the officers and directors of Doral did not abuse their privileged positions of trust, loyalty and fidelity in a manner which caused the Company to violate the law.

55.     The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

C.      **Doral's Code of Ethics**

56.      Doral has established a Code of Business Conduct and Ethics which specifically applies to all directors, officers and employees of the Company, including, but not limited to, its Chief Executive Officer, Chief Financial Officer, Principal Accounting Officer, or persons performing similar functions.

57.      The Code specifically sets forth certain general obligations, including:

- Honesty and candor in our activities, including the observance of the spirit, as well as the letter of the law;

- Avoidance of conflicts between personal interests and the interest of the Company;

- Respecting the confidentiality of information obtained in the course of business;

- Maintenance of our reputation and avoidance of activities which might reflect adversely on the Company;

- Integrity in dealing with the Company's assets;

- Full, fair, accurate, timely and understandable disclosures in the Company's filings with government authorities and in other public communications made by the Company;

- Prompt internal reporting to appropriate persons; and

- Accountability for adherence to the Code.

58.      As to reporting of the Company's financial information, the Code requires the Board and the Company's executive officers to properly maintain the Company's financial information:

All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation. The records, data and information that the Company owns, collects, uses and manages must be precise and complete.  Each of our directors, officers and employees is personally responsible for the integrity of the records, data and information under his or her control.  Records must be maintained in sufficient detail as to accurately reflect all of the Company's transactions.  Financial statements must always be prepared in accordance with generally accepted accounting principles and

- 19 -

fairly present, in all material respects, the Company's financial condition and results of operation.

**D.**  **Duties and Responsibilities of the Audit Committee**

59.     The charter of the Company's Audit Committee requires the Board to properly oversee and maintain the Company's financial information.   The Audit Committee charter specifically provides:

> The Audit Committee (the "Committee") of Doral Financial Corporation (the "Corporation") is created by the Board of Directors of the Corporation to:
>
> Assist the Board in monitoring and oversight of (i) the effectiveness of the Corporation's system of internal controls, (ii) the integrity of the consolidated financial statements of the Corporation, (iii) the compliance by the Corporation with legal and regulatory requirements, (iv) the independent auditor's qualification and independence, (v) the performance of the Corporation's internal audit function and independent auditors, and (vi) the Corporation's ethical conduct and the implementation of the Code of Business Ethics and Conduct.
>
> Provide direct oversight of the corporate internal audit function and the Independent Registered Public Accounting Firm (including oversight of such accountant's appointment, compensation, qualifications and independence).
>
> Prepare the audit committee report included in the Corporation's annual proxy statement required by Item 407(d)(3)(1) of Regulation S-K issued by the Securities and Exchange Commission (the "SEC").

60.     Additionally, the Audit Committee charter requires its members to be knowledgeable in financial matters, and at least one member of the Committee must be a "financial expert." The Audit Committee charter provides that:

> The Committee shall consist of three or more members, each of whom shall be considered "independent" under applicable laws, regulations and the rules of the New York Stock Exchange Inc., as such requirements are interpreted by the Board of Directors in its business judgment, and the Sarbanes-Oxley Act of 2002 (the "Sarbanes- Oxley Act"), including the rules and regulations of the SEC thereunder. Each member will be "financially literate" (or will become so within a reasonable time after his or her appointment to the Committee), and collectively the members shall have such other qualifications as may be mandated by law or the rules and regulations of the SEC.  At least one member of the Committee shall be a "financial expert" under the requirements of the Sarbanes Oxley Act, and at least one member (who may also serve as the Committee financial expert) shall have "accounting or

related financial management expertise," as such qualifications are interpreted by the Board of Directors in its business judgment.

61.         Moreover the Audit Committee charter requires that:

The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of the Independent Registered Public Accounting Firm (the "Independent Auditor") (including resolution of disagreements with between management and the Independent Auditor regarding financial reporting) for the purposes of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation, and the Independent Auditor must report directly to the Committee.

62.         Among the duties of the Audit Committee,  its members are required to:

Annually review the scope of the proposed internal audit, external audit, and credit review activities and review the actual coverage of those activities….
Discuss with management and the Independent Auditor, the audited consolidated financial statements and the results of the Independent Auditor's annual examination, with particular emphasis on:

* * *

Significant accounting policies and audit conclusions regarding accounting estimates, including the nature of any significant changes, adjustments, reclassifications, or disclosures proposed by the Independent Auditor… .

63.         Significantly, the Audit Committee is also required to:

[R]eview with management, the Independent Auditor and the internal auditor:

o Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles and major *issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies*;

o Analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and

o The effect of significant regulatory and accounting initiatives, including off-balance sheet structures, on the Corporation's financial statements."

* * *

- 21 -

***Quarterly receive a report on any significant deficiency or material weakness in the Corporation's internal controls*** or any fraud involving an employee associated with internal controls.

***Annually review the Corporation's disclosure controls and procedures, including the Corporation's internal controls***.

### RULE 23.1 DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

64.     Plaintiff hereby incorporates ¶¶ 1-__ above.

65.     Plaintiff is currently beneficial or record owner of ___ shares of common stock, and has continuously held an equity interest in the shares of Doral since _____, intends to maintain such an interest throughout the pendency of this action, and otherwise has standing to bring this derivative action.

66.     Plaintiff brings this action derivatively in the right of and for the benefit of the Company to redress injuries suffered by the Company as a direct result of Defendants' wrongdoing. This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have. Plaintiff will adequately and fairly represent the interests of Doral and its shareholders in enforcing and prosecuting their rights.

**A.     <u>Plaintiff Is Excused From Making a Demand Since Doral's Board Knew or Recklessly Disregarded Facts Surrounding the Company's Restatement and Acknowledgement of Material Weakness in the Company's Internal Controls</u>**

67.     The Board (or at the very least a majority of it) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiff has not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

68.     The acts complained of herein constitute violations of fiduciary duties of good faith, loyalty, and candor owed by the Board to the Company and its shareholders.

69.     Although the members of the Board were required, pursuant to their fiduciary duties as Board members and as members of specific committees of the Company's Board, as well as by the Consent Order and Written Agreement, to monitor and ensure that the operations of the

Company were based on sound business judgment, the members of the Board failed to exercise their duties, thereby causing and/or permitting Doral to engage in the conduct described above, exposing the Company to civil liability, including loss of millions of dollars in shareholder equity, further regulatory scrutiny and reputational harm.

70.     In order to bring this action for breaching their fiduciary duties, each of the Individual Defendants would have to sue himself and/or his fellow directors and allies in the top ranks of the Company, and to expose each of them to a substantial risk of liability which each director of the Board would not do. Therefore, the Board is not able to vigorously prosecute any such action and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves and one another.

71.     Because of their participation in the mismanagement of the Company, gross dereliction of fiduciary duties, breaches of the duties of good faith and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action. Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action.

72.     Additionally, each of the Individual Defendants named herein received payments, benefits, stock options and other emoluments by virtue of their membership on the Board and their control of Doral. They have thus benefited from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

73.     As of the filing of this Complaint, the Board of Directors consists of six (6) members: Defendants Buchert, Gilleran, Jacobs, King, Smith, and Wakeman. If three or more members of the Board lack independence or disinterestedness, then the Board does not contain a majority of independent or disinterested directors, and thus demand on such a board would be futile.

74.     Defendant Wakeman lacks the independence and disinterestedness required to impartially consider a demand by Plaintiff. Wakeman has been President and CEO of Doral since August 15, 2006, and President of Doral Bank since October 2008. He was President and Chief Operating Officer ("COO") of Doral from May 2006 to August 2006. By virtue of holding these

- 23 -

positions, Wakeman is not independent by the Company's own admission under the rules of the New York Stock Exchange.  Wakeman has received substantial monetary compensation and other benefits from Doral, with total compensation including salary, bonuses, stock awards, tax reimbursements, and other compensation of over $4.6 million in 2012, over $3.5 million in 2011, and over $5.3 million in 2010.  Further, Wakeman faces a substantial likelihood of liability in connection with the wrongdoing alleged herein, as he was the CEO and President of the Company the entire time that Doral admitted to the material weakness in the Company's internal controls.  Moreover, Wakeman signed the Written Agreement, which imposed a heightened duty upon the Board to monitor and oversee Doral's financial reporting.  Further, he was responsible for directing the Company's day-to-day operations and for overseeing its corporate development and strategic planning, and he certified all the SEC filings that contained misleading information about the Company's financial results in violation of federal securities laws.

75.     Defendant Buchert lacks the disinterestedness required to impartially consider a demand by Plaintiff.  As a designated financial expert, Buchert must meet specific requirements.  According to Item 407(d)(5)(ii) of Regulation S-K under the Securities Exchange Act of 1934, an audit committee financial expert, such as Buchert, means a person who has the following attributes: (i) an understanding of generally accepted accounting principles (GAAP) and financial statements; (ii) the ability to assess the general application of such principles in connection with the accounting for estimates, accruals and reserves; (iii) experience preparing, auditing, analyzing or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrants' financial statements, or experience actively supervising one or more persons engaged in such activities; (iv) an understanding of internal control over financial reporting; and (v) an understanding of audit committee functions.  As the Audit Committee's financial expert, Director Burchert would have understood that Doral's internal controls were deficient and its ALLL violated GAAP.  Burchert was responsible for preventing the Company from taking these improper actions, which he failed to do.  Thus, Burchert as a member of the Audit Committee and as the

designated financial expert, faces a substantial likelihood of liability by this action and is disabled from performing a disinterested view of the claims in this case, and from acting to bring a suit and remedy the wrongs described herein.

76.     The members of the Audit Committee, Defendants Buchert, Gilleran, and Smith, lack the disinterestedness required to impartially consider a demand by Plaintiff.  The members of the Audit Committee were responsible for the review with management and the Company's auditor concerning "[m]ajor issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles and major *issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies.*"  Moreover, the Audit Committee was required to receive a quarterly report on any significant deficiency or material weakness in the Corporation's internal controls or any fraud involving an employee associated with internal controls, and annually review the Company's disclosure controls and procedures, including the Company's internal controls.  Thus, given that the Company has admitted to the material weakness in its internal control over financial reporting, that the Company's prior financial statements for the period ending September 30, 2013 required revision, and that the Company was unable to timely file its Form 10-K as a result of the accounting control deficiencies, Defendants Buchert, Gilleran and Smith face a substantial likelihood of liability by this action and are disabled from performing a disinterested view of the claims in this case, and from acting to bring a suit and remedy the wrongs described herein.

77.     The members of the Board who are also members of the Bank Board, Defendants Gilleran, Buchert, Jacobs, and Wakeman, lack the disinterestedness required to impartially consider a demand by Plaintiff.  As members of the Bank Board, Defendants Gilleran, Buchert, Jacobs, and Wakeman are specifically bound by the terms of the Consent Agreement.  They were required to increase their oversight and monitoring of Doral Bank's financial reporting and operations, and specifically reviews of the bank's internal controls and ALLL.  Thus, given that Doral Bank is the largest division of the Company, that the Company has admitted to the material weakness in its

- 25 -

internal control over financial reporting, that the Company's prior financial statements for the period ending September 30, 2013 required revision, and that the Company was unable to timely file its Form 10-K as a result of the accounting control deficiencies, and given their overlapping board directorships, Defendants Gilleran, Buchert, Jacobs, and Wakeman face a substantial likelihood of liability by this action and are disabled from performing a disinterested view of the claims in this case, and from acting to bring a suit and remedy the wrongs described herein.

78.      Each member of the Board lacks the disinterestedness required to impartially consider a demand by Plaintiff.  As members of the Board, each Defendant authorized the execution, and is bound by the terms of, the Written Agreement.  Pursuant to its terms, they were each required to increase their oversight and monitoring of the Company's financial reporting and operations, and specifically reviews of the Company's internal controls and ALLL.  Thus, given that the Company has admitted to the material weakness in its internal control over financial reporting, that the Company's prior financial statements for the period ending September 30, 2013 required revision, and that the Company was unable to timely file its Form 10-K as a result of the accounting control deficiencies, each Defendant faces a substantial likelihood of liability by this action and is disabled from performing a disinterested view of the claims in this case, and from acting to bring a suit and remedy the wrongs described herein.

**B.**      **The Defendants' Wrongful Acts Are Not Protected By The Business Judgment Rule.**

79.      Furthermore, pre-suit demand on the Board would have been futile because the wrongs complained of herein were not, and could not have been, an exercise of good faith business judgment.  Making a demand on the Board of Directors is excused if there is reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment and, therefore, are entitled to the protection of the business judgment rule.  To benefit from the protection of the business judgment rule, a director must be informed of all material information reasonably available and, being so informed, the director must act with requisite care in discharging his or her duties.  To meet the standard of care, in light of the information which the Defendants knew, they were

obligated to take actions in the best interests of the Company, to the exclusion of their personal pecuniary interests, conduct full and adequate investigation into decisions affecting the Company and its assets, and ensure that the Company was in compliance with applicable laws and regulations.

80.     The Defendants cannot defend their actions by any alleged "independent" business judgment since each of them acted in bad faith, grossly and recklessly abused their discretion, acted in breach of their fiduciary duties to the Company and its stockholders and failed to act and abdicated their functions and duties as directors.  And because the Defendants engaged in acts of misconduct and wrongdoing, as described above, those acts were not the product of a valid exercise of business judgment and not entitled to the protections of the business judgment rule.  The Defendants failed to act to protect the interests and business assets of Doral, and failed to ensure that Doral complied with relevant laws and regulations.  Failure to take such protections and engagement in egregious unethical conduct could not have been a valid exercise of business judgment.

81.     Demand is excused because, as detailed above, Defendants caused, or through a lack of reasonably prudent oversight allowed, the Company to conclude that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013 and to issue financial statements in violation of GAAP.

82.     Accordingly, demanding that the Defendants take action before this lawsuit was filed would have been futile and, therefore, the demand requirement is excused.

## AIDING AND ABETTING AND CONCERTED ACTION

83.     In committing the wrongful acts alleged herein, each Individual Defendant has pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

84.     The purpose and effect of the Individual Defendants' common course of conduct was, among other things, to disguise their violations of law and breaches of fiduciary duty, and to enhance

executive and directorial positions and receive substantial compensation and/or fees as a result thereof.

85.       The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct.  During this time, the Individual Defendants caused the Company to conceal the true fact that Doral was misrepresenting the financial status of its business and financial results.

86.       The Individual Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently violate state and federal law, the federal securities laws, and abdicate their duties as directors.  Each Individual Defendant was a direct, necessary and substantial participant in the common enterprise and/or common course of conduct complained of herein.

87.       Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

88.       At all times relevant hereto, each Individual Defendant was an agent of each of the other Individual Defendant and were at all times acting within the course and scope of such agency.

**FIRST CAUSE OF ACTION**
**For Breaches of Their Fiduciary Duties of Loyalty and Good Faith**
(Against All Individual Defendants)

89.       Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

90.       The Individual Defendants each owed Doral and its shareholders the highest fiduciary duties of loyalty, good faith and due care in managing and administering the Company's affairs.

91.       The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls and financial affairs of Doral.  By virtue of their duties of loyalty, good faith and due care:

(a)     The Individual Defendants were required to exercise reasonable control and supervision over the Company's officers, employees, agents, business, and operations;

(b)     The Individual Defendants were required to make inquiries, use sound business judgment, and remain informed about Doral's financial performance and operations, and upon receiving notice or information of an imprudent, unsound or unlawful decision, condition, or practice, the Individual Defendants were required to undertake a reasonable investigation in connection therewith, were required to undertake steps to correct the decision, condition, or practice, and to make public disclosure of such decisions, condition, or practices in a timely and forthright manner; and

(c)     The Individual Defendants were required to accurately calculate and report to Doral's shareholders the value of the Company's assets.

92.     The Individual Defendants breached their fiduciary duties owed to Doral and its shareholders, or aided and abetted in the breach of other defendants' fiduciary duties, by willfully, recklessly and intentionally failing to perform their fiduciary duties.  They caused the Company to waste valuable assets, unnecessarily expend corporate funds, and failed to properly oversee Doral's business, rendering them personally liable to the Company.

93.     Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial health of the Company and failed to correct those representations.

94.     All Individual Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

95.     The Individual Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

96.     As a direct and proximate result of Individual Defendants' breaches of their fiduciary duties of loyalty, good faith and due care, and aiding and abetting those breaches, as alleged herein, Doral has sustained and continues to sustain significant damages and a drastic diminution in value. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## SECOND CAUSE OF ACTION
### For Gross Mismanagement
(Against All Individual Defendants)

97.     Plaintiff incorporates by reference all prior paragraphs as if fully set forth herein.

98.     As detailed more fully herein, the Individual Defendants each owed a duty to Doral and its shareholders to prudently supervise, manage and control Doral's operations.

99.     The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties to prudently manage Doral's business and assets.

100.    As such, the Individual Defendant subjected Doral to the unreasonable risk of substantial losses by failing to exercise due care and by failing to use sound business judgment, including their failure to understand and monitor the Company's fiscal and financial performance. The Individual Defendants breached their duties of due care and diligence in managing and administering Doral's affairs and by failing to prevent a waste of Company assets.

101.    When discharging their duties, the Individual Defendants knew or recklessly disregarded the wrongful conduct described herein, and either approved management's activities or failed to supervise such activities in accordance with their duties. The Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of Doral and its assets.

102.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, Doral has sustained damage and continues to sustain significant damages and a drastic diminution in value. As a result of the misconduct alleged herein, all Individual Defendant are liable to the Company.

## PRAYER FOR RELIEF

103.    WHEREFORE, Plaintiff prays for judgment in the Company's favor against the Individual Defendants as follows:

A.      Determining this action is a proper derivative action, Plaintiff is an adequate representative on the Company's behalf, and demand is excused;

B.    Determining the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Doral;

C.    Declaring that the Individual Defendants are obligated to indemnify and hold Doral harmless from any fines, penalties, judgment, settlement or award pursuant to any of the class actions pending or to be filed against Doral or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

D.    Awarding Doral the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

E.    Awarding Doral exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of the Individual Defendants to the community according to proof at trial;

F.    Awarding Doral restitution from each Defendant;

G.    Ordering all Individual Defendants to return to Doral all incentive-based or equity-based compensation paid to them by the Company during the time they were in breach of their fiduciary duties that they owed to Doral;

H.    Awarding Doral equitable or injunctive relief as permitted by law;

I.    Awarding Doral punitive damages;

J.    Directing Doral to take all necessary actions to reform and improve its corporate governance;

K.    Awarding pre-judgment and post-judgment interest as allowed by law;

L.    Awarding Plaintiff the costs and disbursements of this derivative action, including reasonable attorneys' fees, costs and expenses; and

M.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues.

DATED: 19th day of April, 2014, at         **ESPADA, MIÑANA & PEDROSA LAW OFFICES PSC**
San Juan, Puerto Rico

- 31 -

/s/ Luis E. Miñana
Luis E. Miñana, Esq.
USDC-PR No. 225608
**Espada, Miñana & Pedrosa Law Offices, PSC**
122 Calle Manuel Dómenech Altos
Urb, Baldrich
San Juan, PR  00918
minanalaw@yahoo.com
Tel.:  (787) 758-1999 Fax:  (787) 773-0500
Mob.(787) 402-2226

~and~

Héctor Eduardo Pedrosa-Luna, Esq.
USDC-PR No. 223202
P.O. Box 9023963
San Juan, PR  00902-7511
Tel.:  (787) 920-7983 Fax:  (787) 764-7511

~and~

Eric Quetglas-Jordan
**QUETGLAS LAW OFFICES**
USDC-PR No. 202514
PO Box 16606
San Juan, PR 00908-6606
Tel:  (787) 722-0635/(787) 722-7745
Fax:  (787) 725-3970

~and~

**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Tel.:  (860) 537-5537
Fax:  (860) 537-4432

**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY  10174
Tel:  (212) 223-6444
Fax:  (212) 223-6334
***Counsel for Plaintiff***

- 32 -

## VERIFICATION

I, Luis E. Miñana, hereby declare as follows:

1.      I am counsel for plaintiff in the above-entitled action.  I have read the foregoing Complaint and know the contents thereof.  I am informed and believe the matters therein are true and on that ground allege that the matters stated therein are true.

2.      I make this Verification because plaintiff is temporarily absent from Puerto Rico where I maintain my office.

Executed this 19th day of April, 2014, at San Juan, Puerto Rico.


Dated: April 19, 2014                _/s/ Luis E. Miñana_____
                                         LUIS E. MIÑANA