# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| FAIR VIEW SERVICE STATION, INC., derivatively for the benefit of and on behalf of Nominal Defendant DORAL FINANCIAL CORPORATION,<br><br>        Plaintiff,<br><br>   vs.<br><br>GLEN R. WAKEMAN, DENNIS G. BUCHERT, JAMES E. GILLERAN, DOUGLAS L. JACOBS, DAVID E. KING, and GERALD L. SMITH,<br><br>        Defendants,<br><br>and<br><br>DORAL FINANCIAL CORPORATION, a Puerto Rico Corporation,<br><br>        Nominal Defendant. | CIVIL ACTION NO.: 3:14-cv-01326-SEC<br><br>**JURY TRIAL DEMANDED**<br><br><br><br>**CONSOLIDATED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** |
| ROBERT CORWIN, Derivatively on Behalf of Nominal Defendant, DORAL FINANCIAL CORPORATION,<br><br>        Plaintiff,<br><br>   vs.<br><br>GLEN R. WAKEMAN, DENNIS G. BUCHERT, JAMES E. GILLERAN, DOUGLAS L. JACOBS, DAVID E. KING, and GERALD L. SMITH,<br><br>        Defendants,<br><br>and<br><br>DORAL FINANCIAL CORPORATION, a Puerto Rico Corporation<br><br>        Nominal Defendant. | CIVIL ACTION NO.: 3:14-cv-01555-SEC |

Co-Lead Plaintiffs Fair View Service Station, Inc. and Robert Corwin (collectively, "Plaintiffs"), by and through their undersigned attorneys, derivatively on behalf of Doral Financial Corporation ("Doral" or the "Company"), allege as follows, upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through their attorneys, which included, among other things, interviews of former employees with knowledge of the events at issue, a review and analysis of Doral's public filings with the U.S. Securities and Exchange Commission ("SEC"), the Federal Reserve System, Federal Deposit Insurance Corporation ("FDIC"), news reports, press releases, and other publicly available sources.

## I.     NATURE OF ACTION

1.     This is a shareholder derivative action brought by Plaintiffs, stockholders of record of Doral, on behalf of Nominal Defendant Doral, and all Doral shareholders against certain current and former members of the Company's Board of Directors (identified below as the "Individual Defendants").  This derivative action arises from the Individual Defendants' breaches of their fiduciary duties of loyalty, candor, and good faith and abuse of their control of Doral in connection with their causing, approving, and/or acquiescing in: (1) Doral's issuance of false and misleading financial reports and financial statements filed with the SEC that violated Generally Accepted Accounting Principles ("GAAP"); (2) Doral operating its business without effective internal controls; and (3) Doral's violation of the terms of the Consent Order (defined below) and the Written Agreement (defined below).

A.    **Consent Order and Written Agreement**

2.    On August 8, 2012, Doral's largest subsidiary, Doral Bank ("Doral Bank"), whose board contains a majority of the Doral Board of Directors, executed and entered into a Stipulation and Consent Order with the FDIC (the "Consent Order"). One month later, on September 11, 2012, Doral itself entered into a written agreement with the Federal Reserve Bank of New York (the "Reserve Bank") (the "Written Agreement") relating to Doral's mortgage-related activities, which replaced and superseded a previous Cease and Desist Order with the Board of Governors of the Federal Reserve System. The Written Agreement, which was entered into by the Company and executed by defendant Wakeman, required Doral to implement certain plans to strengthen credit risk management policies for loans held by the Company, standards for assessing the credit quality of loans, monthly reporting to the Board of Directors, and additionally required improvement in overseeing Doral's loan grades, trends in asset quality, nonperforming loans, and strengthening the quality of the Company's loans.

3.    The Written Agreement further required the Company to eliminate assets qualified as a "loss" and establish an Allowance for Loan and Lease Losses ("ALLL") methodology for loans held by Doral consistent with supervisory guidance. Moreover, the Company is to submit a quarterly written report regarding the Board of Directors' review of ALLL and a description of any changes to the methodology used for determining the amount of ALLL.

4.    The Written Agreement also required the Company to submit acceptable written accounting and internal control policies and procedures, including reporting procedures, to ensure that management and the Board of Directors and its committees

receive timely, informative, and accurate reports necessary to effectively manage risk and correct weaknesses and deficiencies associated with accounting and financial reporting.

5.     The Written Agreement additionally required the Company to submit an acceptable written plan to maintain sufficient capital at Doral on a consolidated basis, including "the adequacy of the Bank's capital, taking into account the volume of classified credits, concentrations of credit, allowance for loan and lease losses, current projected asset growth, and projected retained earnings."

6.     The Consent Order likewise required the board of Doral Bank (the "Bank Board") to increase its oversight of the affairs of Doral Bank and assume full responsibility for the approval of sound policies and objectives.  The Bank Board is required to hold monthly meetings to review areas including nonaccrual, nonperforming, classified and recovered loans, adoption of operating policies, audit reports, and internal control reviews.  The Company is required to document these reviews and approvals in the Bank Board's minutes.  The Consent Order specifically required Doral Bank to develop a comprehensive policy and methodology for determining ALLL, which is to be reviewed by the Bank Board and reported in the quarterly Consolidated Reports of Condition and Income.

7.     The Consent Order also required the Doral Board to develop a written capital plan ("Capital Plan") that detailed the manner in which Doral Bank would meet and maintain a Tier 1 Capital Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10%, and a Total Risk-Based Capital Ratio of at least 12%.  Thus, as detailed below, the Consent Order required Doral Bank to maintain a higher amount of capital than was otherwise necessary under applicable regulations.

### B.      The Consent Order and Written Agreement Are Violated

8.      Despite the Board's requirement to establish policies and actively monitor the Company's financial reporting and ALLL as set forth in the Written Agreement and as reinforced in the Consent Order, on March 18, 2014, the Company announced that it could not timely file its Form 10-K for the year ending December 31, 2013 due to the fact that the Company had discovered a material weakness in its internal controls over financial reporting and disclosure controls and that such controls were ineffective as of December 31, 2013.

9.      On March 21, 2014, the Company further stated that it had determined to revise its financial statements for the quarter ending September 30, 2013.  The Company reported a restated net loss of $50.9 million for the quarter ending December 31, 2013. In addition to admitting material weakness in its internal controls, Doral's provision for loan losses for the quarter ended September 30, 2013 increased by $7.2 million or approximately 30%, to $23.6 million.   Additionally, Doral admitted that its net loss attributable to common shareholders increased from $1.49 per share to $2.57, or 42%, per share outstanding.

10.     Despite the Board's requirement to review Doral Bank's adherence to the Capital Plan, on May 1, 2014, the Company announced that Doral Bank was no longer in compliance with its capital requirements under its Consent Order with the FDIC because it could not use the tax receivable of $229.9 million to meet its capital requirement.

11.     Specifically, on May 1, 2014, Doral announced that the FDIC advised that it may no longer include in its calculation of its Tier 1 Capital some or all of the tax receivables from the Government of Puerto Rico: "Puerto Rico tax receivables accounted

for $289 million of the bank's approximately $679 million of Tier 1 Capital at December 31, 2013.   The FDIC's determination will cause Doral Bank to no longer be in compliance with its capital requirements under its Consent Order with the FDIC."

12.     Shortly, thereafter, on May 13, 2014, the Company stated that it could not timely file its Form 10-Q for the quarter ended March 31, 2014 with the SEC because it had received a Report of Examination issued by the FDIC and the Puerto Rico Office of the Commissioner of Financial Institutions ("PR Commissioner") notifying the Company that it may no longer include in its calculation of Tier 1 Capital certain tax receivables from the Government of Puerto Rico.   The Report also instructed the Company to recognize certain charges related to loans and non-performing assets, and to evaluate certain assumptions in the ALLL and for modified loans.

13.     On May 30, 2014, the Company received a letter from the Federal Reserve Bank of New York (the "Reserve Bank") stating that the Reserve Bank had determined that the Company must classify a tax receivables agreement totaling $229.9 million from the Commonwealth of Puerto Rico as a loss and write off the asset on the balance sheet of the Company.   The Company also stated that it was working to determine whether an impairment charge to the Puerto Rico tax receivables asset in the second quarter of 2014 was appropriate under GAAP.

14.     On August 4, 2014, the Company received a subpoena from the SEC informing the Company that the SEC was investigating certain matters related to the Company's filings with the SEC, including the Company's determination regarding the inclusion of certain tax receivables from the Government of Puerto Rico as Tier 1 capital,

the Company's ALLL for the quarter ended September 30 2013, and Doral Bank's compliance with its Consent Order with the FDIC and PR Commissioner.

15.     Due in large part to the above, Doral has not filed a financial report with the SEC on Forms 10-Q or 10-K since March 21, 2014.

**C.      The Individual Defendants' Breaches of Fiduciary Duty**

16.     This action seeks redress for the Individual Defendants' collective and individual breaches of their fiduciary duties of loyalty, good faith, and candor, and their knowing, reckless and/or gross negligence in, *inter alia*: (i) allowing the Company to file false and misleading financial statements; (ii) allowing the Company to maintain insufficient capital to meet its regulatory requirements; (iii) failing to properly implement, oversee and maintain appropriate and adequate accounting and business ethics, internal controls, practices and procedures; and (iv) harming the value of the Company by the wrongful conduct engaged in by the Individual Defendants.

17.     Each of the Individual Defendants, and especially the Defendants who were on the Audit Committee, were well aware of the prior internal controls issues, as well as GAAP regulations regarding accounting for ALLL.  Indeed, the Consent Order and Written Agreement, either directly or indirectly, imposed on the Individual Defendants an affirmative duty to, among other things, implement policies and procedures designed to prevent Doral from engaging in further violations of GAAP and to prevent further harm from the admitted material weakness in internal controls.  The Individual Defendants, nevertheless, failed to do so.

18.     As a result of Defendants' breaches, Doral has suffered significant damage, and that damage continues to increase.  In addition to tremendous reputational

damage, Doral is required to incur increased costs for doing business, its ability to borrow money is now decreased and the terms of its borrowing will cause it to incur greater costs than if the Company were well capitalized and not subject to further governmental scrutiny.  In addition, Doral has been exposed to potential criminal and civil liability, including a class action alleging violations of the federal securities laws, has and will incur significant costs responding to the SEC investigation, has lost the ability to accept, renew or roll over brokered deposits,[1] and has and will incur substantial costs to remedy the lack of internal controls.  Moreover, and as a result of Defendants' actions, Doral stock has lost approximately 20% of its value, erasing tens of millions of dollars in shareholder equity, and making it even more difficult to borrow money cheaply.

## II.    JURISDICTION

19.    This Court has jurisdiction pursuant to 28 U.S.C. §1331.  Such jurisdiction exists because Plaintiffs' state law claims are dependent on the resolution of substantial questions of federal law.  Specifically, Plaintiffs allege that the Individual Defendants breached their fiduciary duties to Doral and its shareholders by allowing Doral to violate the federal securities laws. Second, the federal contribution claims asserted herein arise under and pursuant to the provisions of the Sections 10(b) and 21(D) of the Securities Exchange Act ("Exchange Act"), 15 U.S.C. §78(j)(b) and 15 U.S.C. §78u-4(g).  Plaintiffs also assert pendant common law claims under 28 U.S.C. §1367.  Moreover, this Court has jurisdiction as Plaintiffs' claims arise under federal laws or regulations and involve

---

[1]    As of April 21, 2014, brokered deposits accounted for approximately 18% of Doral's total funding of operations.

filings with the SEC, the Reserve Bank, and the FDIC. *See, e.g., D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 100-03 (2d Cir. 2001).

20.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

21.     Venue is proper in this Court because one or more of the Defendants either resides in or maintains offices in this District, a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to Doral occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    PARTIES

### A.    Plaintiffs

22.     Plaintiff Fair View Service Station, Inc. ("Fair View") is and was a shareholder of nominal defendant Doral at all relevant times.

23.     Plaintiff Robert Corwin ("Corwin") is and was a shareholder of nominal defendant Doral at all relevant times.

### B.    Nominal Defendant

24.     Nominal Defendant Doral Financial Corporation, Inc. is a Puerto Rico corporation with its principal executive offices located at 1451 Franklin D. Roosevelt

Avenue, San Juan, Puerto Rico 00920.  According to Doral's filings with the SEC, Doral Financial Corporation was organized in 1972 under the laws of the Commonwealth of Puerto Rico and operates as a bank holding company.  Doral's principal operations are conducted in Puerto Rico, with growing operations in the United States, specifically in the New York City metropolitan area, as well as in northwest and south Florida.  Doral has four wholly owned subsidiaries: Doral Bank ("Doral Bank"), Doral Insurance Agency, LLC ("Doral Insurance Agency"), Doral Recovery, Inc. ("Doral Recovery I"), and Doral Properties, Inc. ("Doral Properties").  The Company has over 6.6 million shares of common stock issued and outstanding which trade on the New York Stock Exchange under the ticker symbol "DRL."

### C.    Individual Defendants

25.    Defendant Glen R. Wakeman ("Wakeman") has served as President, Chief Executive Officer, and a member of the Board of Directors of Doral since August 2006. Wakeman has served as the President of Doral Bank since October 2008.  Wakeman previously served as President and Chief Operating Officer of Doral from May 2006 to August 2006.

26.    Defendant Dennis G. Buchert ("Buchert") is the Chairman of the Board and has served as a Director of Doral since October 2006.  Buchert was Chairman of the Board of Doral from January 2007 to July 2007.

27.    Defendant James E. Gilleran ("Gilleran") has served as a director of Doral since December 2007.  Gilleran has been Management Consultant of the Company since May 2007.

28.     Defendant Douglas L. Jacobs ("Jacobs") has served as a director of Doral since February 2009.

29.     Defendant David E. King ("King") has served as a director of Doral since July 2007.

30.     Defendant Gerard L. Smith ("Smith") has served as a director of Doral since June 2008.

31.     Defendants Wakeman, Buchert, Gilleran, Jacobs, King, and Smith are collectively referred to herein as "Defendants" or "Individual Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     <u>Background</u>

#### 1.     Doral Was and Is Required to Maintain an Adequate Allowance for Loan and Lease Losses

32.     ALLL represents a reserve that banks are required to maintain for impaired loans (or leases) – and is a critical accounting metric.

33.     Pursuant to GAAP, Doral was, and is, required to maintain an allowance for impaired loans and leases to reflect the difference, if any, between the principal balance of the loan (or lease) and the present value of projected cash flows, observable fair value, or collateral value.   An impaired loan is a loan for which it is probable that the lender will not collect all amounts due under the contractual terms of the loan.   An allowance for loan and lease losses (sometimes referred to herein as ALLL) is established and maintained via a provision for loan and lease losses (sometimes referred to herein as PLLL), in the form of a charge against earnings.

34.     In light of the critical importance of ALLL to a lending institution's financial statements, on December 13, 2006, the FDIC and the Board of Governors of the

Federal Reserve System, together with other banking regulators, jointly issued an

Interagency Policy Statement on the Allowance for Loan and Lease Losses, which stated,

in part, that:

> The ALLL represents one of the most significant estimates in an institution's financial statements and regulatory reports. Because of its significance, each institution has a responsibility for developing, maintaining, and documenting a comprehensive, systematic, and consistently applied process for determining the amounts of the ALLL and the provision for loan and lease losses (PLLL). To fulfill this responsibility, each institution should ensure controls are in place to consistently determine the ALLL in accordance with GAAP, the institution's stated policies and procedures, management's best judgment and relevant supervisory guidance.
>
> As of the end of each quarter, or more frequently if warranted, each institution must analyze the collectability of its loans and leases held for investment . . . and maintain an ALLL at a level that is appropriate and determined in accordance with GAAP. An appropriate ALLL covers estimated credit losses on individually evaluated loans that are determined to be impaired as well as estimated credit losses inherent in the remainder of the loan and lease portfolio. [Footnotes omitted.]

35.     The Consent Order and the Written Agreement both specifically mandated

that Doral comply with the above edict.

36.     GAAP provides that collateral dependent loans meeting the criteria for

impairment are to be measured based on the fair value of the loan's collateral. *See, e.g.*,

Financial Accounting Standards Board ("FASB") Accounting Standards Codification

("ASC") Topics 310 and 450.

### 2.     Relevant Capital Metrics

37.     As a bank holding company, Doral is subject to supervision and

examination by federal and local banking regulators, including the FDIC, the Federal

Reserve Bank of New York (the "FRBNY"), and the Office of the Commissioner of

Financial Institutions of Puerto Rico (the "PR Commissioner"). These agencies have the

authority to assess civil money penalties, issue cease and desist orders, and initiate injunctive actions against banking organizations for violations of laws and regulations and unsafe or unsound banking practices.

38.     Under the Federal Deposit Insurance Corporation Improvement Act of 1991 ("FDICIA"), federal banking regulators must take "prompt corrective action" with respect to banks that do not meet minimum capital requirements.

39.     The relevant capital metrics are the "Total Risk-Based Capital Ratio," the "Tier 1 Risk-Based Capital Ratio," and the "Tier 1 Leverage Ratio."[2]

40.     At least half of a bank's Total Risk-Based Capital must be comprised of Tier 1 Capital, which may include common equity, retained earnings, minority interests in unconsolidated subsidiaries, noncumulative perpetual preferred stock, and a limited amount of cumulative perpetual preferred stock (in the case of a bank holding company), minus goodwill and certain other intangible assets.  The remainder may consist of Tier 2 Capital, which may include a limited amount of subordinated debt, other preferred stock, certain other instruments, and a limited amount of loan and lease loss reserves.

41.     A bank's Total Risk-Based Capital Ratio is derived by taking the sum of its Tier 1 and Tier 2 Capital, and dividing it by all of the bank's assets, weighted by credit risk.  A bank's Tier 1 Risk-Based Capital Ratio is derived by dividing its Tier 1 Capital by all of the bank's assets, weighted by credit risk.  In computing total risk-weighted assets, a bank's assets are given risk-weightings ranging from 0% for the least risky

---

[2]     The "Total Risk-Based Capital Ratio" and the "Tier 1 Risk-Based Capital Ratio  are sometimes referred to herein as the "Total Capital Ratio" and the "Tier 1 Capital Ratio," respectively.  The "Tier 1 Leverage Ratio" is sometimes referred to herein as the "Tier 1 Capital Leverage Ratio."

assets (such as obligations backed by the full faith and credit of the U.S. Government), to 200% for the riskiest assets (such as non-investment grade mortgage-backed securities).

42.     Finally, a bank's Tier 1 Leverage Ratio is the ratio of its Tier 1 Capital to total assets, minus goodwill and certain other intangible assets.

43.     The FDICIA establishes five capital tiers: "well-capitalized," "adequately capitalized," "undercapitalized," "significantly undercapitalized," and "critically undercapitalized."

44.     A bank is considered to be: (i) "well-capitalized" if it maintains a Tier 1 Leverage Ratio of at least 5%, a Tier 1 Risk-Based Capital Ratio of at least 6%, and a Total Risk-Based Capital Ratio of at least 10%, and is not subject to any written agreement or regulatory directive to meet a specific capital level; (ii) "adequately capitalized" if it is not well-capitalized but maintains a Tier 1 Leverage Ratio of at least 4% (or at least 3% if given the highest regulatory rating and not experiencing or anticipating significant growth), a Tier 1 Risk-Based Capital Ratio of at least 4%, and a Total Risk-Based Capital Ratio of at least 8%; (iii) "undercapitalized" if it fails to meet the standards for adequately capitalized institutions (unless it is deemed to be significantly or critically undercapitalized); (iv) "significantly undercapitalized" if it has a Tier 1 Leverage Ratio of less than 3%, a Tier 1 Risk-Based Capital Ratio of less than 3%, or a Total Risk-Based Capital Ratio of less than 6%; and (v) "critically undercapitalized" if it has tangible equity equal to 2% or less of total assets.

45.     The Consent Order required that Doral Bank maintain even higher capital ratios than those necessary for an institution to qualify as "well-capitalized," specifically

mandating a Tier 1 Leverage Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10%, and a Total Risk-Based Capital Ratio of at least 12%.

46.     The FDICIA generally prohibits a bank from making any capital distribution or paying a dividend or management fee to its holding company if the bank would thereafter be undercapitalized.  Undercapitalized banks are also subject to growth limitations and restrictions on borrowing from the Federal Reserve System, and are required to submit capital restoration plans to federal banking regulators.  If a bank fails to timely submit an acceptable plan, it is treated as if it were significantly undercapitalized.  Significantly undercapitalized banks may be subject to a number of requirements and restrictions, including orders to sell sufficient voting stock to become adequately capitalized, orders to reduce total assets, and orders to cease the receipt of deposits.  Critically undercapitalized banks are subject to appointment of a receiver or conservator.

47.     In addition, banks that are not well-capitalized are prohibited from accepting new brokered deposits in the absence of a waiver from the FDIC, and are prohibited from paying attractive interest rates on the brokered deposits they currently hold.

48.     Brokered deposits, which include certificates of deposit and money market deposits, are defined as any deposit with an interest rate of more than 75 basis points above prevailing market rates.  Investors find brokered deposits attractive because they typically offer a higher rate of return.

49.     Under FDIC regulations adopted pursuant to the FDICIA, a bank cannot accept, roll over, or renew brokered deposits unless: (i) it is well-capitalized; or (ii) it is

adequately capitalized and receives a waiver from the FDIC.  Even with such a waiver, a bank that is merely adequately capitalized may not pay an interest rate on any brokered deposits in excess of 75 basis points above prevailing market rates.  By contrast, there are no such restrictions on a bank that is well-capitalized.

50.     Aside from deriving a significant amount of interest income from brokered deposits, during the relevant time period herein, Doral Bank used brokered deposits as a source of long-term funds.    As such, the Bank's liquidity relied (and continues to rely) in part on brokered deposits.  At the end of fiscal years 2011, 2012, and 2013, Doral Bank held a total of approximately $2.2 billion, $2 billion, and $1.4 billion worth of brokered deposits, respectively.

### 3.    Defendants' Prior Accounting Issues and Ongoing Responsibilities to Maintain Adequate Internal Controls

51.     Defendants have a recent track record of disregarding their duty to maintain adequate systems of internal controls and to ensure that the Company is run in a lawful manner.  Many of the Individual Defendants were members of the Board during the time when the Company engaged in or resolved the issues identified in the Consent Order and the Written Agreement.  The Individual Defendants' systematic disregard of corporate responsibilities has resulted in at least one civil whistleblower action, multiple regulatory actions, and culminated in two binding orders against Doral and its largest subsidiary, Doral Bank, which underscore and amplify not only the Individual Defendants' past failures, but their existing obligations to run Doral in a lawful and competent fashion.

52.     According to a lawsuit filed by Ronald Stewart ("Stewart"), Doral's former Principal Accounting Officer, under the whistleblower protection provisions of

the Sarbanes-Oxley Act of 2002 ("Sarbanes-Oxley"), the Company's lack of respect for legal and ethical obligations and for obedience to the regulatory framework came from the very top of the Company.

53.     Stewart was hired by Doral as a Senior Vice-President and Principal Accounting Officer on September 7, 2011.[3]  In this capacity, Stewart reported directly to the CFO of Doral.  On February 16, 2012, Stewart sent a letter to the Chairman of Doral's Audit Committee expressing concerns regarding "deficiencies in the Bank's program of internal controls as required by Sarbanes-Oxley."  Stewart was concerned that because of "comments, the indicated environment, and other observed internal control weaknesses," that potential deficiencies in Doral's system of internal controls "could potentially rise to the level of a material weakness and go unreported."

54.     Stewart alleges that defendant Wakeman directed him and others to distort the Company's financial reports, stating that Wakeman commented as follows: "I want our leverage ratio over 9% even if that means booking assets in later periods."  Stewart's concern about the overall internal control environment was further heightened when, while discussing a possible transaction with the Puerto Rican Department of Treasury that would increase regulatory capital potentially required under any future enforcement action by regulators, Defendant Wakeman said, "I don't care about the Regulators.  I will do whatever it takes to make this deal work and if it means going against the Regulators that's a risk I will take . . . . the Regulators will not tell me what I can or cannot do when I am trying to increase the Bank's capital by $200MM."  Stewart was concerned that such

---

[3]     All factual allegations regarding Stewart are taken from the complaint filed in *Stewart v. Doral Financial Corporation*, 13-cv-01349-DRD (D.P.R. May 6, 2013).

comments indicated an environment that could result in employees responsible for internal controls feeling pressure to misrepresent the performance of internal controls, which could in turn lead to misstatements of the financial condition of Doral.

55.     Stewart further alleged that Wakeman constantly undermined the credibility of Doral's CFO, and that the relationship between Wakeman and the CFO adversely impacted the ability of the internal control system of Doral to ensure accurate financial reporting.

56.     Stewart also expressed concern in his letter to the Chairman of the Audit Committee about a corporate initiative known as "Role Clarity," which was aimed at reducing costs and personnel, but without giving consideration to internal controls when personnel decisions were made, or to the transition of internal control responsibilities when personnel change was involved.

57.     Stewart concluded that the above issues combined to put the Company at risk of non-compliance with the legal duty under Sarbanes-Oxley to accurately report financial information and/or report material weaknesses in the Company's internal control program in public filings.

58.     Stewart alleges that he was terminated on March 15, 2012, less than one month after sending his letter to the Chairman of the Audit Committee of Doral, and that the termination was in retaliation for the letter.  Stewart filed a whistleblower complaint under Sarbanes-Oxley on May 6, 2013.  Motions to dismiss filed by Doral were denied by this Court in an order dated February 21, 2014.[4]

---

[4]     *See Stewart v. Doral Financial Corp.*, Civil No. 13-1349 (DRD), 2014 WL 661587 (D.P.R. February 21, 2014).

59.     On August 8, 2012, Doral Bank entered into the Consent Order as part of the FDIC's investigation into Doral.  Much of the Consent Order is directed specifically at the board of Doral Bank.  Four defendants in this action – Gilleran, Buchert, Jacobs, and Wakeman – concurrently serve on the Bank Board, and thus are bound by, and should be familiar with, its terms.  The Consent Order contained, *inter alia*, the following provisions:

BOARD PARTICIPATION

(a) **The Board shall increase its oversight of the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives and for the oversight of all of the Bank's activities**, consistent with the role and expertise commonly expected for directors of banks of comparable size.

(b) This oversight shall include meetings to be held no less frequently than monthly at which, at a minimum, the following areas shall be reviewed and approved: reports of income and expenses; to the extent appropriate, new, overdue, renewal, insider, charged off, delinquent (30 to 89 days), nonaccrual, nonperforming, classified and recovered loans; investment activity; internal loan watch; liquidity levels and funds management; adoption or modification of operating policies; individual committee reports; audit reports; **internal control reviews including managements' responses**; reconciliation of general ledger accounts; and compliance with this ORDER. Board minutes shall document these reviews and approvals, including the names of any dissenting directors.

* * *

MANAGEMENT

2. (a) The Bank shall have and retain qualified management. At a minimum, such management shall include: a chief executive officer with proven ability in managing a bank of comparable size and complexity and experience in upgrading a low quality loan portfolio; a senior lending officer with an appropriate level of lending, collection, and loan supervision experience for the type and quality of the Bank's loan portfolio; and a chief financial officer with demonstrated ability in all financial areas including, but not limited to, accounting, regulatory reporting, budgeting and planning, management of the investment function, liquidity management, and interest rate risk management.  The

Board shall provide the necessary written authority to management to implement the provisions of this ORDER.

(b) The qualifications of management shall be assessed on its ability to: (i) comply with the requirements of this ORDER; (ii) operate the Bank in a safe and sound manner; (iii) comply with applicable laws, rules, and regulations; and (iv) restore all aspects of the Bank to a safe and sound condition, including capital adequacy, asset quality, management effectiveness, earnings, liquidity, and sensitivity to interest rate risk.

(c) Within 45 days from the effective date of this ORDER, the Bank shall retain a third-party bank consultant who is acceptable to the Regional Director and the Commissioner who will develop a written analysis and assessment of the Bank's Board and management needs ("Management Report") for the purpose of ensuring appropriate Board oversight and providing qualified management for the Bank.

\* \* \*

(f) The Management Report shall be developed within 60 days from the date the Regional Director and the Commissioner issue a letter of non-objection to the engagement of the third-party bank consultant and shall include, at a minimum: (i) identification of both the type and number of Board and senior executive officer positions needed to properly oversee the Bank's management and supervise the affairs of the Bank, respectively; (ii) identification and establishment of such Board and management committees as are needed to provide guidance and oversight to the Bank's management; (iii) evaluation of all Board members and senior executive officers to determine whether these individuals possess the ability, experience and other qualifications required to perform present and anticipated duties, including adherence to the Bank's established policies and practices, and restoration and maintenance of the Bank in a safe and sound condition; (iv) evaluation of the compensation of all of the officers senior executive officers and directors of the Bank, including salaries, director fees, and other benefits; (v) evaluation of the reasons for the excessive turnover in officer/senior executive officer positions at the Bank since 2006; and (vi) a plan to recruit and hire any additional or replacement personnel with the requisite ability, experience and other qualifications to fill any director or officer senior executive officer positions identified in the Management Report.

(g) Within 30 days from receipt of the Management Report, the Bank shall formulate a written plan ("Management Plan") that incorporates the findings of the Management Report, a plan of action in response to each recommendation contained in the Management Report, and a time frame for completing each action.

- 19 -

(h) At a minimum, the Management Plan shall: (i) contain a recitation of the recommendations included in the Management Report, a plan of action to respond to each recommendation, and a time frame for completing each action; (ii) include provisions to implement necessary training and development for the Bank's management; (iii) establish procedures to periodically review and update the Management Plan, as well as periodically review and assess the performance of each senior executive officer; and (iv) contain a current management succession plan.

(i) The Management Plan shall be submitted to the Regional Director and the Commissioner for non-objection or comment.  Within 30 days from receipt of non-objection or any comments from the Regional Director and the Commissioner, and after incorporation and adoption of all comments, the Board approve the Management Plan, which approval shall be recorded in the minutes of the Board meeting.  Thereafter, the Bank shall implement and fully comply with the Management Plan.[5]

60.     The Consent Order contained multiple further specific directives to Doral Bank and the Bank Board, relating to, among other things, proper treatment of loss charge-offs; reduction of delinquencies and classified assets; development of a written capital plan; ALLL; a review of bank loan policies and procedures, including a review of Doral Bank's loan portfolio and modification programs; an appraisal compliance program revision; a strategic plan; and creation of a compliance committee.  Doral Bank was further prohibited from paying dividends without prior permission and was required to submit quarterly progress reports.

61.     With respect to the ALLL, the Consent Order required Doral Bank and the Bank Board to develop and implement "a comprehensive policy and methodology for determining the allowance for loan and lease losses ('ALLL Policy')" and conduct a quarterly review of the ALLL in accordance with:  (i) Financial Accounting Standards Board ("FASB") ASC 310-40 and FASB ASC 310-10-35-2 through 30; (ii) the FFIEC's

---

[5]     All emphasis in this Consolidated Complaint is added, unless otherwise stated.

Instructions for the Call Report; (iii) the *Interagency Statement of Policy on the Allowance for Loan and Lease Losses* (FIL-105-206, issued December 13, 2006); (iv) other applicable regulatory guidance that addresses the appropriateness of Doral Bank's ALLL; and (v) any analysis of Doral Bank's ALLL provided by the FDIC.

62.     In addition, the Consent Order required Doral Bank to: (i) "establish a program of independent loan review that will provide for a periodic review of the Bank's loan portfolio and the identification and categorization of problem credits"; and (ii) among other things, implement "a mechanism for reporting . . . no . . . less than quarterly, the information developed" through the loan review program "to the Board."

63.     The Consent Order also required Doral Bank to "revise its appraisal compliance program, including enhancing Doral Bank's appraisal policy to capture risk management and internal controls that ensure that appraisals are obtained in a timely manner . . . and that appraisals contain appropriate valuation approaches to support assigned values."

64.     The Consent Order also requires Doral Board to develop a written Capital Plan that details the manner in which Doral Bank will meet and maintain a Tier 1 Capital Ratio of at least 8%, a Tier 1 Risk-Based Capital Ratio of at least 10%, and a Total Risk-Based Capital Ratio of at least 12%.  The Consent Order requires that the Board review Doral Bank's adherence to the Capital Plan at a minimum on a monthly basis.

65.     The Consent Order further required the Board to establish a Compliance Committee of at least three directors not involved in the daily operations of Doral Bank. "Within 30 days from the effective date of this ORDER, and at monthly intervals thereafter, such Compliance Committee shall prepare and present to the Board a written

report of its findings, detailing the form, content, and manner of any action taken to ensure compliance with this ORDER and the results thereof, and any recommendation with respect to such compliance.  A copy of the report and any discussion related to the report or this ORDER shall be part of the minutes of the Board meeting.  Copies of the monthly report shall be submitted to the Regional Director and Commissioner as part of the progress reports required by this ORDER.  ***Nothing contained herein shall diminish the responsibility of the entire Board to ensure compliance with the provisions of this ORDER***."

66.    As stated above, a majority of the Board – four of six directors – concurrently sits on the Bank Board.  Specifically, Defendants Gilleran, Buchert, Jacobs, and Wakeman, as members of the Bank Board, are bound by the terms of the Consent Order.  The remainder of the Board was well aware of the Consent Order, and indeed, the entire Board has an ongoing duty to ensure that Doral Bank – the largest segment of Doral – is run soundly and in accordance with the provisions of the Consent Order.

67.    On September 11, 2012, Doral entered into the Written Agreement with the Reserve Bank, its primary supervising regulator.  The Written Agreement replaces and supersedes a Cease and Desist Order entered into between Doral and the Board of Governors of the Federal Reserve System on March 16, 2006.

68.    The Written Agreement was necessitated by "deficiencies at Doral relating to Doral's credit risk management and credit administration practices," and was authorized by the entire Board, who thereby consented to comply with each of its provisions.

69.    The Written Agreement requires that the Board:

(a) take appropriate steps to fully utilize its financial and managerial resources to serve as a source of strength to Doral Bank, including steps to ensure that Doral Bank complies with any supervisory action taken by Doral Bank's federal and state regulators;

(b) undertake a management and staffing review to aid in the development of a suitable management structure that is adequately staffed by qualified and trained personnel;

(c) *establish programs, policies and procedures acceptable to the Federal Reserve relating to credit risk management practices, credit administration, loan grading, asset improvement, other real estate owned ("OREO"), the allowance for loan and lease losses ("ALLL"), accounting and internal controls, and internal audit*;

(d) not declare any dividends without the prior written approval of the Federal Reserve and the Director of Banking Supervision and Regulation of the Board of Governors;

(e) not directly or indirectly take any dividends or any other form of payment representing a reduction of capital from Doral Bank without the prior approval of the Federal Reserve;

(f) not, directly or indirectly, incur, increase, or guarantee any debt without the prior written approval of the Federal Reserve;

(g) *submit to the Federal Reserve an acceptable written plan (and any updates) to maintain sufficient capital at the Company on a consolidated basis*; and

(h) seek regulatory approval prior to the appointment of a new director or senior executive officer, any change in a senior executive officer's responsibilities, or making certain severance or indemnification payments to directors, executive officers, or other affiliated persons.

70.      The Written Agreement further requires Doral to submit quarterly progress reports to the Federal Reserve.  As with the Consent Order, the Written Agreement serves to highlight and deepen the already stringent duties of the Board to run Doral faithfully and to establish internal controls sufficient to prevent the type of unlawful and shoddy practices that led to the Consent Order and the Written Agreement.

71.      Each of the Individual Defendants was a member of the Board at the time that the Written Agreement was authorized and executed, and is personally subject to the applicable provisions thereof.

4.     **The Individual Defendants Fail to Fulfill the Requirements of the Consent Order and Written to the Detriment of Doral and Doral Bank**

72.     Far from complying with the Consent Order and Written Agreement, former hi-level Doral employees described how executives flagrantly disregarded internal controls in order to understate the Company's ALLL, and concealed numerous problems with loan review, appraisals, and the ALLL model itself, all of which undermined the accuracy of Doral's ALLL.

73.     CW1 is a former Vice President who worked at Doral from August 2012 through April 2014, and was involved with Doral's financial reporting and regulatory compliance. CW1's responsibilities included, among other things, assisting in the preparation of SEC filings, regulatory reports, and reports provided to the Company's executive management, including the Individual Defendants.  For the first 18 months of employment, CW1 reported directly to Doral's Principal Accounting Officer, Nancy Reinhard (who is presently Doral's acting CFO), who in turn reported to CFO Rob Wahlman.  CW1 reported directly to Wahlman's successor, Dave Hooston, for the final six months of CW1's employment.   CW1 was also Secretary of the Disclosure Committee, which determined issues to be considered for disclosure in Doral's Forms 10-Q and 10-K, and of which defendant Wakeman was Chairman.

74.     CW2 was employed by Doral as a Senior Credit Risk Analyst from September 2012 through July 2013.  CW2 aided in the creation of presentations made on a monthly and quarterly basis to Doral's Board of Directors, as well as for Doral's Risk Policy Committee and the ALLL Committee.

75.     CW3 was employed by Doral as a Vice President of Commercial Administration from July 2012 to August 30, 2013.  CW3 was responsible for certain loan portfolios and to ensure compliance with Doral's own loan requirements, as well as the requirements of FDIC, FRB, and Puerto Rican regulations.  In January 2013 CW3 was given responsibility for all servicing problems in the loan portfolio.

76.     CW1 explained that problems existed with both the underlying loan data from which the ALLL was calculated, and with the ALLL model itself.  CW1 stated that underlying loan data used to calculate Doral's ALLL was unreliable, in part because crucial loan data was systematically missing or was incorrect in the loan files.  CW1 stated that Doral did not take the actions necessary to respond to or remedy the errors discovered in the loan files because the Company did not want to spend the necessary resources.

77.     CW1 said that the model that produced the ALLL was based upon a host of assumptions, which were easily and often changed by upper management.  CW1 expressed concerns about this for the duration of her tenure with Doral, and often questioned changes in assumptions being made to largely the same loan portfolios on a quarterly basis.  CW1 concluded that Doral management was changing assumptions in the model to keep the ALLL low enough so that even against a backdrop of real estate loans on properties that experienced significant declines in value, Doral would still maintain adequate Tier 1 Capital and meet regulatory requirements.

78.     CW1 reported that Doral altered its assumptions for non-performing loans to add an extra four days to the 90 day non-payment deadline at which a loan was classified as non-performing.  CW1 explained that this change was made in order to

delay the time when Doral had to reverse the accrued interest on non-performing loans, and to keep the ALLL as low as possible.

79.    CW2 ran the ALLL model each month, using accurate inputs and actual data supplied by the Finance Department.  The report created from this actual data was presented to executive management for review.  Doral's CFO and Controller would then work with the Finance Department to decide on changes to the model.  According to CW2, these changes were made because the actual results would show that the bank was not sufficiently liquid or capitalized.   These monthly changes were reviewed and approved by CEO Wakeman, along with Doral's CFO and Chief Credit Officer for the U.S.  CW2 and CW2's team would then change specific inputs as directed, which would consistently generate more favorable results that were sufficient to preserve the bank's financial compliance.  Once the management-directed changes to the ALLL model were made, CEO Wakeman met with the Board or a committee thereof, pursuant to the agreements in place that called for increased Board oversight.

80.    CW2 described the ALLL manipulation process as "applying the wrong rates to the wrong assumptions."   False results from altered inputs became changed assumptions in the model without any statistical proof and analytical support, in order to "make the portfolio look better."

81.    According to CW2, the Individual Defendants moved assets around to justify Doral's ALLL because if loan losses were higher, Doral would have had to increase its ALLL, which in turn would have negatively impacted the capital ratios.  By understating Doral's ALLL, Defendants correspondingly overstated the Company's assets and net income, which in turn, overstated the Company's capital and artificially

inflated its regulatory capital ratios.  CW2 commented that if Doral had used proper methodologies, the Company would have become illiquid.

82.     CW1 reported that Doral changed the ALLL model every quarter from at least August 2012 through April 2014 – and that the alterations were done not to make sound methodological changes, but to achieve the desired result of maintaining the ALLL at as low a level as possible.  The assumptions for likelihood of default and cumulative values assumed for collectability of Doral Bank's loans were changed until final ALLL calculations preserved Doral's Tier 1 capital position at levels acceptable to management.

83.     According to CW1, the Company's Form 10-Ks would reflect changes to the ALLL each quarter, but it was not disclosed that the actual ALLL calculation, based on accurate assumptions, had been adjusted downward to bring the ALLL down and within a range acceptable to management.  According to CW1, while management was preparing Doral's 2013 Form 10-K, an error was discovered in the ALLL model.  Once the error was corrected, management was unhappy with the resulting impact on the ALLL, and subsequently adjusted the ALLL to achieve a more favorable figure.

84.     The Individual Defendants caused or allowed the Company to publicly state that the amount of capital that the Company and Doral Bank were required to maintain was adequate.  However, the Individual Defendants were able to achieve the reported capital ratios, in part, by understating Doral's ALLL.

85.     CW1 believed that the Board was informed of ALLL calculations each quarter, the final ALLL results, and that the management directed adjustments were also generally described and characterized as "improvements" that ended up generating the favorable results.

- 27 -

86.     CW1 stated that knowing there were quarterly changes to the ALLL would normally have caused a person to ask questions, even if that person had access to professional accounting resources, such as those available to the Board.  CW1 was familiar with the special qualifications and financial expertise of defendant Buchert in particular, and stated that CW1 would have expected that Buchert would question these very issues.  Had the Board fulfilled its obligations under the Consent Agreement "to *increase its oversight of the affairs of the Bank, assuming full responsibility for the approval of sound policies and objectives and for the oversight of all of the Bank's activities*, consistent with the role and expertise commonly expected for directors of banks of comparable size" and to implement "a comprehensive policy and methodology for determining the allowance for loan and lease losses ('ALLL Policy')," the aforementioned manipulations would not have occurred.

### 5.     The Invalid Tax Receivable

87.     In addition to participating in, and/or failing to implement policies that would prevent, the manipulation of the ALLL, the Individual Defendants failed to disclose the known, material risk that the largest single component of the Company's capital, a $229,884,087 purported tax receivable (the "Tax Receivable") from the Puerto Rico Treasury Department (the "Treasury Department"), was at risk of non-payment – a fact which the Individual Defendants knew as a result of their regular communications with representatives from the Treasury Department.

88.     According to Doral, the Company entered into an agreement with the Puerto Rican Department of Treasury on March 26, 2012, (the "2012 Closing Agreement") because it was apparent that the Company "would not be able to realize the

full value of its tax asset before it expired," and – significantly – Doral "***could not use the tax asset to satisfy [its regulatory] capital requirements***."  Following the 2012 Closing Agreement, Doral recognized $229,884,087 – approximately one third of Doral's Tier 1 Capital – as a tax receivable and included the Tax Receivable in its Tier 1 Capital.  The Treasury Department later challenged the legitimacy of the 2012 Closing Agreement and the Tax Receivable.

89.     CW1 held concerns about the collectability of this receivable, given the poor financial condition of the Puerto Rican government, its history with Doral, and the fact that it had never made any payments for years after the Departamento de Hacienda de Puerto Rico ("Hacienda") struck the deal with Doral.  CW1 was confident that considering the above factors, the amount should have been substantially less, a material reduction to a percentage of the full amount.  CW1 said collectability could have been around 80% to 90% in certain quarters, and in others where Puerto Rico had downgrades or notable declines, the amount could have dropped to 60%.  Once Hacienda (the Puerto Rican tax authority) denied that the amount was owed in April 2014, then both bank policy and regulatory requirements would have imposed a 100% reserve, reducing value on the books to zero at least until actual collection.

90.     The issue of collectability for the tax receivable was raised by CW1 to Nancy Reinhard, Doral's Principal Accounting Officer, now acting CFO, who then came back to CW1 confirming that management did not want to apply any reserve and the full value should continue to be included as an asset.

91.     CW1 stated that Defendants knew there was a risk that the Treasury Department would not pay Doral the Tax Receivable due to the financial instability of the

Puerto Rican government.  CW1 also explained that there were internal discussions at Doral each quarter about whether to continue to include the Tax Receivable in the Company's Tier 1 Capital.  According to CW1, ***many of these discussions were held at the executive level at audit committee meetings***, which were attended by CW1's direct supervisor, Nancy Reinhard.  CW1 also was involved in quarterly discussions with Reinhard and Doral's CFO regarding whether to continue to include the Tax Receivable in Doral's Tier 1 Capital.  This was plainly material information, the inclusion of which was necessary to fully understand and accurately present Doral's financial statements, and yet none of it was disclosed to investors.  According to CW1, by early 2014, the FDIC was closely scrutinizing Doral's inclusion of the Tax Receivable in its Tier 1 Capital.

92.    CW1 further stated that because of the risk of non-payment of the Tax Receivable, the Company should have maintained a reserve or recorded an impairment on its value.  This would have reduced the amount available to Doral Bank to use in its calculation of regulatory capital.

93.    CW1 left in April of 2014 because CW1's own accounting principles were more conservative than the aggressive practices observed at Doral – specifically the inclusion of the full amount of the $230 million receivable without any loss allowance when collectability was clearly doubtful; and the consistent manipulation of ALLL assumptions in what was a practice that CW1 believed was designed to manage results for favorable earnings reporting while concealing managements methodology.

94.    One reason for leaving identified in CW1's resignation letter to the Company was the changes made to the ALLL model each quarter, and CW1's conclusion

that this was done by executive management to achieve desirable results rather than a result based on truthful and accurate assumptions. CW1 also expressed knowledge that the Board of Directors consistently approved the manipulated changes, and that scrutiny should have been applied to the executives for making these regular changes which was highly unusual.

95.    CW1 stated that had the ALLL assumptions been made accurately, and maintained rather than regularly tweaked by management, that Doral would have booked much higher losses and been prevented from meeting its capital and liquidity requirements. The $230 million tax asset should also have been appropriately reduced and reserved for, and along with continued losses that should have been reported, the bank's capital should have been far lower in the financial reports.

96.    CW3 handled day-to-day operations of loan administration, identifying problems with non-performing loans. CW3 stated that the commercial portfolio for loans in Puerto Rico consisted of about 3,500 loans, of which between 700 and 800 were non-performing.

97.    Part of CW3's responsibilities included identification of specific loans that were the subject of not compliant or non-conforming, develop corrective action plans, and begin cleaning up pre-existing compliance issues. CW3 identified servicing issues, lack of adequate procedures and inadequate record keeping. CW3 further found that when reviewing loan files, underwriting documents were consistently incomplete, and material information was missing. CW3 further stated that many of the loans made were to borrowers who did not demonstrate that they were qualified to borrow, that the property was adequately appraised, that the property was properly inspected, or that

adequate collateral was made.  CW3 was unable to determine if certain commercial loans identified as "performing" should have actually been considered to be nonperforming, but believed that there were more loans that should have been documented as being in default or non-conforming status than what Doral reflected "on the books" for commercial loans.

6.     **Defendants' Material Misrepresentations to the Investing Public and Failure to Maintain Adequate Internal Controls**

98.      On November 5, 2013, Doral filed a Form 10-Q with the SEC, reporting on the Company's third quarter 2013 results.  Among other financial results, the Company stated the following:

> Net loss for the three months ended September 30, 2013 totaled $7.5 million, compared to a net loss of $32.5 million for the comparable 2012 period.  The Company's net loss decreased $25.1 million, due to a decrease of $18.0 million in the PLLL, a decrease of $5.1 million in non-interest expense, a decrease of $1.6 million in income tax expense and an increase of $1.4 million in net interest income, partially offset by a decrease in non-interest income of $1.0 million.
>
> * * *
>
> The provision for loan and lease losses for the three months ended September 30, 2013 was $16.4 million, reflecting a decrease of $18.0 million when compared to the $34.4 million provision for the corresponding 2012 period.  The decrease in the PLLL is mostly related to: (i) enhancements in the assumptions of the model; and (ii) a decrease of $24.3 million in charge-offs recorded for the three months ended September 30, 2013 when compared to the same period in 2012.

99.      In a press release dated November 5, 2013, the Company reported its improving financial results, claiming in part:

> Doral Financial reduced its net loss for the third quarter ended September 30, 2013 to $7.5 million.  This compares to net losses of $10.4 million and $32.5 million for the second quarter ended June 30, 2013 and the year ago quarter ended September 30, 2012, respectively.  Doral Financial's net loss attributable to common shareholders for the three months ended September 30, 2013 was $9.9 million.  For the second quarter of 2013, the net loss attributable to common shareholders was

$12.8 million and for the third quarter of 2012 the net loss attributable to common shareholders was $35.0 million.

Defendant Wakeman touted the success of Doral's strategy, stating:

> **The third quarter demonstrated continued progress for Doral as we work towards building a profitable and stronger bank.** Our decision to divide operations into Doral Growth, a profitable mortgage and commercial bank, and Doral Recovery, a special servicing portfolio, have allowed us to weather the continued economic recession in Puerto Rico. We continue to take advantage of significant opportunities in our U.S. mainland operation and remain committed to creating affordable mortgage solutions for our customers and local communities in Puerto Rico.

100.    On March 18, 2014, Doral filed a Form 12b-25 with the SEC, serving as a notification that Doral would be unable to timely file its Form 10-K annual report.  Doral stated the following in explaining the delay:

> These delays were primarily a result of performing additional analyses and reviews of the Company's process for estimating its allowance for loan losses and evaluating the effectiveness of the Company's disclosure controls and procedures and changes in internal control over financial reporting.  **The Company has concluded that it has a material weakness in its internal control over financial reporting as of December 31, 2013**, related to the review of the underlying data and mathematical model supporting its allowance for loan and lease losses and the related provision for loan and lease losses.  As a result of the material weakness, **the Company has concluded that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013**.  While the Company has implemented processes and controls to address this material weakness during the fourth quarter, **management has determined that sufficient time has not passed to conclude that the weakness has been remediated**.

101.    In the same Form 12b-25, Doral released preliminary financial results for the year ending December 31, 2013.  The results showed a dramatic deterioration in the fiscal health of the Company over the previous year.  According to the Form 12b-25:

> The Company presently estimates that it will incur a net loss for the year ended December 31, 2013 of approximately $88.3 million, compared to a net loss of $3.3 million for the year ended December 31, 2012.  Based on current estimates, when comparing 2013 results to 2012 results, the

Company's performance variance resulted from the following: (i) an increase in net interest income of $5.7 million; (ii) a decrease of $102.5 million in the provision for loan and lease losses; (iii) a $12.8 million decrease in non-interest income; (iv) an increase of $18.3 million in non-interest expense; and (v) a decrease in income tax benefit of $162.0 million. These 2013 estimates are based on preliminary information and as such are subject to change as the Company continues to work on the preparation of its audited consolidated financial statements for the year ended December 31, 2013.

102.     Later in the same Form 12b-25, Doral announced that it had determined a need to restate its financial statements for the quarter ending September 30, 2013.  As a result of the restatement, Doral reported that its provision for loan losses for that quarter rose from the previously reported $16.4 million to $23.6 million – an increase of 44% – and that its net loss was $14.7 million, or $2.57 per share outstanding on a fully diluted basis as compared to the previously reported amounts of $7.5 million and $1.49.

103.     The admissions by Doral of a material weakness in, and ineffectiveness of its internal controls, along with the announcement of the restatement of its financial results for the third quarter of 2013, came barely 18 months after Doral entered into the Consent Order and Written Agreement, which expressly charged the Board with monitoring Doral Bank's ALLL program and with establishing effective accounting and internal controls.  The failure to do so is a clear breach of the Individual Defendants' fiduciary duties of good faith and oversight over the Company's financial reporting.

104.     In the wake of this shocking announcement, the price of Doral common stock plummeted.  After closing at $12.30 per share on March 17, 2014, the day before the filing of the Form 12b-25, Doral shares fell $1.13 – or 9% – the following day, and have continued to tumble, reaching as low as $8.59 as of March 28, 2014 – an all-time low, and a decline of over 30% from pre-disclosure levels.  This drop represents a loss of tens of millions of dollars in market capitalization, and immediately harmed Doral's ability to raise capital cheaply.  Doral has also suffered significant reputational damage as

a result of these events, is being investigated by the SEC, and may face civil and criminal penalties due to its violations of the Consent Order and Written Agreement.

105.    On May 1, 2014, the Company filed a Form 8-K with the FDIC disclosing its non-compliance with the capital requirements of the Consent Order and Written Agreement:

> ***Doral's insured bank subsidiary, Doral Bank, has been advised by the Federal Deposit Insurance Corporation (the "FDIC") that it may no longer include in its calculation of its Tier 1 Capital some or all of the tax receivables from the Government of Puerto Rico. Puerto Rico tax receivables accounted for $289 million of the bank's approximately $679 million of Tier 1 Capital at December 31, 2013. The FDIC's determination will cause Doral Bank to no longer be in compliance with its capital requirements under its Consent Order with the FDIC. Pursuant to the Consent Order Doral Bank is not permitted to accept, renew, or roll over any brokered deposits unless it has been granted a brokered deposit waiver by the FDIC. In conversations with the FDIC, the FDIC indicated that until such time as Doral Bank provides revised capital calculations that incorporate this & adjusts the FDIC would not consider granting Doral Bank waivers to accept brokered deposits.*** At April 21, 2014, brokered deposits accounted for approximately 18% of the total funding of Doral's operations. Doral has been working to reduce its reliance on brokered deposits and one of the goals of its current business plan is to eliminate its reliance on brokered deposits. Doral Bank believes that as part of its capital plan it must seek immediate financial support from equity and debt holders and/or external sources.

> Under the terms of its Consent Order dated August 8, 2012 issued by the FDIC, in the event any capital ratio falls below the minimum required by the Consent Order, Doral Bank is required to either (i) increase capital in an amount sufficient to comply with the capital ratios as set forth in Doral Bank's approved capital plan, or (ii) submit to the FDIC a contingency plan for the sale, merger, or liquidation of Doral Bank in the event the primary sources of capital are not available within 120 days. Doral also expects that it may have to submit a new capital plan to the Federal Reserve Bank of New York ("FRBNY), Doral's primary regulatory authority, for approval.

> \*\*\*

> Doral is developing a revised capital plan for regulatory approval. Doral currently projects it can continue  to finance its operations at least through the remainder of 2014 without the use of additional brokered deposits as Doral currently has other sources of liquidity. Nonetheless, unless Doral

can effectuate a capital plan (which would include a recapitalization and restructuring of Doral) that complies with regulatory requirements (1) Doral's financial condition and results of operations will be materially and adversely affected, (2) Doral may not be able to effectuate the recapitalization and restructuring plans that Doral believes are necessary to comply with regulatory requirements or Doral does effectuate such plans that Doral can restructure and recapitalize its balance sheet and businesses on terms that will preserve the value of its outstanding debt and equity, (3) Doral may not be able to obtain on an ongoing basis an unqualified opinion of Doral's independent auditors, and (4) Doral's regulators may take additional regulatory action against Doral .

106.   On May 15, 2014, the Company filed a Form 12b-25, Notice of Late Filing with the SEC concerning its Form 10-Q for the quarter ended March 31, 2014.

Although management of Doral Financial Corporation (the "Company") has been working diligently to complete all of the required information for its Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2014 (the "Form 10-Q"), the Company is unable, without unreasonable effort or expense, to complete the financial statements and related disclosures to be included in the Form 10-Q on or before May 12, 2014, due to unanticipated delays experienced in the preparation of the Form 10-Q. These unanticipated delays are primarily the result of the receipt by the Company on May 1, 2014, of a joint Report of Examination of Doral Bank issued by the Federal Deposit Insurance Corporation and the Puerto Rico Office of the Commissioner of Financial Institutions for the review period ending March 31, 2013 (the "Report") in which Doral Bank was notified that it may no longer include in its calculation of Tier 1 Capital certain tax receivables from the Government of Puerto Rico. For additional information on the disallowance of the Puerto Rico Government tax receivables in the Tier 1 Capital of the Doral Bank please see the Company's Form 8-K filed with the Securities and Exchange Commission on May 1, 2014. The Report also instructs the Company to recognize certain charges related to loans and non-performing assets, and to evaluate certain assumptions in the Allowance for Loan Losses and for modified loans. The Company cannot finalize the preparation of its quarterly financial statements as of and for the three months ended March 31, 2014 until the Company has fully assessed the impact of the Report on its business, engaged in additional discussions with the regulators, including reviewing whether to appeal certain findings set forth in the Report and has reviewed certain valuation methodologies and estimates as requested by Doral Bank's regulators.

107.    Notably, Doral has not filed a financial report with the SEC on Forms 10-Q or 10-K since March 21, 2014.

108.    Despite the Company's continued assurances that it was adequately capitalized, Defendants' lack of oversight regarding their regulatory capital requirements resulted in the Company's violation of the Consent Order and Written Agreement.  Not surprisingly, after investors received this additional bad news, the price of Doral common stock plummeted 62%, from a closing price of $9.82 per share on May 1, 2014, to close at $3.73 per share on May 2, 2014.

### 7.    Consequences of Wrongdoing

109.    As a result of Defendants' breaches, Doral has already suffered significant damage, and that damage continues to grow.   Doral has experienced tremendous reputational damage due to revelation of the lack of proper internal controls, and the inability to comply with the Consent Order and the Written Agreement.  Doral has been forced to defend multiple civil lawsuits, including the Stewart whistleblower suit and a class action alleging violations of the federal securities laws, *In re Doral Financial Corp. Sec. Litig.*, Master File No. 3:14-CV-01393 (GAG) (D. P.R.), and remains at risk of further civil and criminal liability.  Doral has and will incur large costs in responding to the SEC investigation and regulatory mandates, and has incurred substantial, and growing, costs to remedy the lack of sufficient internal controls.

110.    Doral has been required to incur increased costs for doing business, its ability to borrow money is now decreased, and the terms of its borrowing will cause it to incur greater costs than if the Company were well capitalized and not subject to further governmental scrutiny.  As a result of the Bank's capital shortfall: (i) the FDIC would not grant the Bank waivers to accept brokered deposits – an important source of liquidity; and (ii) the Bank was required to either regain compliance with the Consent Order, or submit to the FDIC a contingency plan for the sale, merger, or liquidation of the Bank.

111.    Moreover, and as a result of Defendants' actions, Doral stock has lost approximately 20% of its value, erasing tens of millions of dollars in shareholder equity, and making it even more difficult to borrow money cheaply.

## V.    THE INDIVIDUAL DEFENDANTS' GENERAL DUTIES AND OBLIGATIONS

112.    By reason of their positions as directors and/or officers of Doral and because of their ability to control the business and corporate affairs of Doral, the Individual Defendants owed Doral and its shareholders fiduciary obligations of care, candor, compliance, fidelity, trust, loyalty, and due care and were and are required to use their utmost ability to control and manage Doral in a fair, just, honest, and equitable manner, and were and are required to act in furtherance of the best interests of Doral and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

113.    Each director and officer of the Company owes to Doral the fiduciary duty to comply with the laws of Puerto Rico and the United States and to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of good faith and fair dealing.

114.    The Individual Defendants were well aware of these obligations.   For example, the Company, in its May 13, 2013 Proxy Statement filed with the SEC on May 12, 2013, specifically stated that the Board of Directors is involved in the oversight of the Company's accounting and internal controls:

> **Our Board of Directors has a significant role in the risk oversight of the Company**.   Our Board of Directors considers effective risk management a fundamental part of good management practice and is committed to maintaining sound risk management systems.  As mentioned above, our Board of Directors has a risk policy committee that is directly responsible for assisting the Board of Directors in discharging its responsibilities relating to enterprise risk management and monitoring the

development and implementation of enterprise risk management strategies throughout the organization. Among other things, the risk policy committee is responsible for assisting the Board of Directors in fulfilling its oversight of the strategies, policies, procedures and systems established by the Company's management relating to the management of interest rate risk, market risk, liquidity risk, operational risk, compliance and legal risk and credit risk as well as overseeing hedging and derivatives activities. The risk policy committee also regularly participates in the review and approval of the Company's allowance for loan losses. In order to carry out its responsibilities, the risk policy committee meets with management to assess the major risks of the Company. After its meetings, the risk policy committee reports to our Board of Directors in full.

115.    In its Form 10-K, filed belatedly with the SEC on March 21, 2014, the Company claimed the following progress and compliance with the Written Agreement and the Consent Order:

As of December 31, 2013, the Company has taken each of the following actions to comply with each main component of the Written Agreement:

(a) The Company has expanded its managerial resources as a source of strength to Doral Bank by hiring a new Chief Financial Officer ("CFO") to succeed the Interim CFO, who was appointed following the resignation of its prior CFO, and other persons in its financial staff. In addition, the Company hired a new Executive Vice President, Head of Puerto Rico Operations for the Company and Doral Bank, who was also appointed to serve as an executive director on the Board of Directors of Doral Bank (the "Bank Board") effective in January 2013. The Company also hired a new Chief Risk and Administrative Officer for Doral Recovery effective August 2013. The Company's Board of Directors (the "Board") also appointed two PR-based individuals to serve as independent directors on the Bank Board effective February 2013. Finally, the Company's Board meets at least quarterly to review the Company's ongoing compliance with the Written Agreement and formed a regulatory committee that meets at least quarterly to closely monitor the Company's compliance with the Written Agreement and Doral Bank's compliance with the Consent Order.

The Company further represented that it had established certain policies and procedures to address ALLL including:

. . . an ALLL program to improve the methodology by which the ALLL is determined, which was reviewed by an independent third party; a capital plan; and a cash flow plan. As of December 31, 2013, most recommendations for further enhancement to the ALLL methodology

developed during the independent third party review have been adopted and implemented.

116.    In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's finances and operations, so that the market price of the Company's stock would be based on truthful and accurate information.

117.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of Doral, were able to and did, directly and indirectly, control the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with Doral, each of the Individual Defendants had access to all non-public information about the financial condition, operations, and future business prospects of Doral, including, without limitation, the illegal and/or improper activities which the Individual Defendants caused Doral to engage in.

118.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of the Company, and was at all times acting within the course and scope of such agency.

119.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial and operational affairs of Doral.  By virtue of such duties, the Individual Defendants were required to, among other things:

    (a)    manage, conduct, supervise, and direct the business and internal affairs of Doral in accordance with the laws and regulations of Puerto Rico, the United States, and pursuant to the charter and bylaws of Doral;

    (b)    neither violate, nor knowingly permit any director, officer, or employee of Doral to violate applicable laws, rules, and regulations;

(c)    remain informed as to the status of Doral's operations, and, upon receipt of notice or information of imprudent or unsound practices, to make a reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as are necessary to comply with applicable laws and regulations;

(d)    establish and maintain systematic and accurate records and reports of the business and internal affairs of Doral and procedures for the reporting of the business and internal affairs to the Board of Directors and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)    maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that Doral's operations would comply with all laws, Doral's financial statements and information filed with U.S. financial regulators and disseminated to the investing public and to Doral shareholders in SEC filings would be accurate and the actions of its directors would be in accordance with all applicable laws; and

(f)    exercise reasonable control and supervision over the public statements to the securities markets, investors, and public shareholders of Doral by the officers and employees of Doral and any other reports or other information required by law from Doral; to examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of Doral; and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

120.    During all times relevant hereto, each of the Individual Defendants occupied positions with Doral or was associated with the Company in such a manner as to make him privy to confidential and proprietary information concerning Doral, its operations, finances, and financial condition.  Because of these positions and such access, each of the Individual Defendants knew that the true relevant facts specified herein had

not been disclosed to, and were concealed from, Doral's shareholders.  The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material information regarding Doral and to take any and all actions necessary to ensure that the officers and directors of Doral did not abuse their privileged positions of trust, loyalty, and fidelity in a manner which caused the Company to violate the law.

121.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

### A.    **Doral's Code of Ethics**

122.    Doral has established a Code of Business Conduct and Ethics which specifically applies to all directors, officers, and employees of the Company, including, but not limited to, its Chief Executive Officer, Chief Financial Officer, Principal Accounting Officer, or persons performing similar functions.

123.    The Code specifically sets forth certain general obligations, including:

- Honesty and candor in our activities, including the observance of the spirit, as well as the letter of the law;

- Avoidance of conflicts between personal interests and the interest of the Company;

- Respecting the confidentiality of information obtained in the course of business;

- Maintenance of our reputation and avoidance of activities which might reflect adversely on the Company;

- Integrity in dealing with the Company's assets;

- Full, fair, accurate, timely and understandable disclosures in the Company's filings with government authorities and in other public communications made by the Company;

- Prompt internal reporting to appropriate persons; and

- Accountability for adherence to the Code.

124.   As to reporting of the Company's financial information, the Code requires the Board and the Company's executive officers to properly maintain the Company's financial information:

> All of the Company's books, records, accounts and financial statements must be maintained in reasonable detail, must appropriately reflect the Company's transactions and must conform both to applicable legal requirements and to the Company's system of internal controls. Unrecorded or "off the books" funds or assets should not be maintained unless permitted by applicable law or regulation. The records, data and information that the Company owns, collects, uses and manages must be precise and complete. Each of our directors, officers and employees is personally responsible for the integrity of the records, data and information under his or her control. Records must be maintained in sufficient detail as to accurately reflect all of the Company's transactions. Financial statements must always be prepared in accordance with generally accepted accounting principles and fairly present, in all material respects, the Company's financial condition and results of operation.

**B.      Duties and Responsibilities of the Audit Committee**

125.   The charter of the Company's Audit Committee requires the Board to properly oversee and maintain the Company's financial information. The Audit Committee charter specifically provides:

> The Audit Committee (the "Committee") of Doral Financial Corporation (the "Corporation") is created by the Board of Directors of the Corporation to:

> Assist the Board in monitoring and oversight of (i) the effectiveness of the Corporation's system of internal controls, (ii) the integrity of the consolidated financial statements of the Corporation, (iii) the compliance by the Corporation with legal and regulatory requirements, (iv) the independent auditor's qualification and independence, (v) the performance of the Corporation's internal audit function and independent auditors, and

(vi) the Corporation's ethical conduct and the implementation of the Code of Business Ethics and Conduct.

Provide direct oversight of the corporate internal audit function and the Independent Registered Public Accounting Firm (including oversight of such accountant's appointment, compensation, qualifications and independence).

Prepare the audit committee report included in the Corporation's annual proxy statement required by Item 407(d)(3)(1) of Regulation S-K issued by the Securities and Exchange Commission (the "SEC").

126.     Additionally, the Audit Committee charter requires its members to be knowledgeable in financial matters, and at least one member of the Committee must be a "financial expert."  The Audit Committee charter provides that:

The Committee shall consist of three or more members, each of whom shall be considered "independent" under applicable laws, regulations and the rules of the New York Stock Exchange Inc., as such requirements are interpreted by the Board of Directors in its business judgment, and the Sarbanes-Oxley Act of 2002 (the "Sarbanes- Oxley Act"), including the rules and regulations of the SEC thereunder.  Each member will be "financially literate" (or will become so within a reasonable time after his or her appointment to the Committee), and collectively the members shall have such other qualifications as may be mandated by law or the rules and regulations of the SEC.  At least one member of the Committee shall be a "financial expert" under the requirements of the Sarbanes Oxley Act, and at least one member (who may also serve as the Committee financial expert) shall have "accounting or related financial management expertise," as such qualifications are interpreted by the Board of Directors in its business judgment.

127.     Moreover, the Audit Committee charter requires that:

The Committee shall be directly responsible for the appointment, compensation, retention and oversight of the work of the Independent Registered Public Accounting Firm (the "Independent Auditor") (including resolution of disagreements with (*sic*) between management and the Independent Auditor regarding financial reporting) for the purposes of preparing or issuing an audit report or performing other audit, review or attest services for the Corporation, and the Independent Auditor must report directly to the Committee.

128.     Among the duties of the Audit Committee,  its members are required to:

- Annually review the scope of the proposed internal audit, external audit, and credit review activities and review the actual coverage of those activities . . . .  Discuss with management and the Independent Auditor, the audited consolidated financial statements and the results of the Independent Auditor's annual examination, with particular emphasis on:

* * *

- Significant accounting policies and audit conclusions regarding accounting estimates, including the nature of any significant changes, adjustments, reclassifications, or disclosures proposed by the Independent Auditor . . . .

129.    Significantly, the Audit Committee is also required to:

- [R]eview with management, the Independent Auditor and the internal auditor:

  o  Major issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles and major *issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies*;

  o  Analyses prepared by management and/or the Independent Auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods on the financial statements; and

  o  The effect of significant regulatory and accounting initiatives, including off-balance sheet structures, on the Corporation's financial statements."

* * *

- *Quarterly receive a report on any significant deficiency or material weakness in the Corporation's internal controls* or any fraud involving an employee associated with internal controls.

- *Annually review the Corporation's disclosure controls and procedures, including the Corporation's internal controls*.

## VI.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

130.    Plaintiffs are currently beneficial or record owners of shares of Doral common stock.  Fair View has continuously held an equity interest in shares of Doral since prior to January 1, 2006, and Corwin has continuously held an equity interest in shares of Doral since July 19, 2004.  Both Plaintiffs intend to maintain such an interest throughout the pendency of this action, and otherwise have standing to bring this derivative action.

131.    Plaintiffs bring this action derivatively in the right of and for the benefit of the Company to redress injuries suffered by the Company as a direct result of Defendants' wrongdoing.  This is not a collusive action to confer jurisdiction on this Court which it would not otherwise have.  Plaintiffs will adequately and fairly represent the interests of Doral and its shareholders in enforcing and prosecuting their rights.

### A.    Plaintiffs Are Excused from Making a Demand since Doral's Board Knew, or Recklessly Disregarded, Facts Surrounding the Company's Restatement and Acknowledgement of Material Weakness in the Company's Internal Controls

132.    The Board (or, at the very least, a majority of it) cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action.  For the reasons that follow, and for reasons detailed elsewhere in this complaint, Plaintiffs have not made (and should be excused from making) a pre-filing demand on the Board to initiate this action because making a demand would be a futile and useless act.

133.    The acts complained of herein constitute violations of fiduciary duties of good faith, loyalty, and candor owed by the Board to the Company and its shareholders.

134.    Although the members of the Board were required, pursuant to their fiduciary duties as Board members and as members of specific committees of the Company's Board, as well as by the Consent Order and Written Agreement, to monitor and ensure that the operations of the Company were based on sound business judgment,

the members of the Board failed to exercise their duties, thereby causing and/or permitting Doral to engage in the conduct described above, exposing the Company to possible civil and criminal liability, including the loss of millions of dollars in shareholder equity, further regulatory scrutiny, and reputational harm.

135.    In order to bring this action for breaching their fiduciary duties, each of the Individual Defendants would have to sue himself and/or his fellow directors and allies in the top ranks of the Company and to expose each of them to a substantial risk of liability, which each director of the Board would not do.  Therefore, the Board is not able to vigorously prosecute any such action and cannot in good faith exercise independent business judgment to determine whether to bring this action against themselves and one another.

136.    Because of their participation in the mismanagement of the Company, gross dereliction of fiduciary duties, and breaches of the duties of good faith and loyalty, Defendants are unable to comply with their fiduciary duties and prosecute this action. Each of them is in a position of irreconcilable conflict of interest in terms of the prosecution of this action.

137.    Additionally, each of the Individual Defendants named herein received payments, benefits, stock options, and other emoluments by virtue of their membership on the Board and their control of Doral.  They have thus benefited from the wrongdoing herein alleged and have engaged in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

138.    As of the filing of this Complaint, the Board of Directors consists of six members: Defendants Buchert, Gilleran, Jacobs, King, Smith, and Wakeman.  If three or more members of the Board lack independence or disinterestedness, then the Board does not contain a majority of independent or disinterested directors, and thus, demand on such a Board would be futile.

139.    Defendant Wakeman lacks the independence and disinterestedness required to impartially consider a demand by Plaintiffs.  Wakeman has been President and CEO of Doral since August 15, 2006, and President of Doral Bank since October 2008.  He was President and Chief Operating Officer ("COO") of Doral from May 2006 to August 2006.  By virtue of holding these positions, Wakeman is not independent by the Company's own admission under the rules of the New York Stock Exchange. Wakeman has received substantial monetary compensation and other benefits from Doral, with total compensation including salary, bonuses, stock awards, tax reimbursements, and other compensation of over $5.3 million in 2010, over $3.5 million in 2011, and over $4.6 million in 2012.  Further, Wakeman faces a substantial likelihood of liability in connection with the wrongdoing alleged herein, as he was the CEO and President of the Company the entire time that Doral admitted to the material weakness in the Company's internal controls.  Moreover, Wakeman signed the Written Agreement, which imposed a heightened duty upon the Board to monitor and oversee Doral's financial reporting.  Further, he was responsible for directing the Company's day-to-day operations and for overseeing its corporate development and strategic planning, and he certified all the SEC filings that contained misleading information about the Company's financial results in violation of federal securities laws.  According to confidential former employee witnesses, Wakeman was directly involved in the quarterly manipulation of the ALLL calculations.

140.    Defendant Buchert lacks the disinterestedness required to impartially consider a demand by Plaintiffs.  As a designated financial expert, Buchert must meet specific requirements.  According to Item 407(d)(5)(ii) of Regulation S-K under the Exchange Act, an audit committee financial expert, such as Buchert, means a person who has the following attributes: (i) an understanding of generally accepted accounting principles (GAAP) and financial statements; (ii) the ability to assess the general application of such principles in connection with the accounting for estimates, accruals,

and reserves; (iii) experience preparing, auditing, analyzing, or evaluating financial statements that present a breadth and level of complexity of accounting issues that are generally comparable to the breadth and complexity of issues that can reasonably be expected to be raised by the registrants' financial statements, or experience actively supervising one or more persons engaged in such activities; (iv) an understanding of internal control over financial reporting; and (v) an understanding of audit committee functions.  As the Audit Committee's financial expert, Director Buchert would have understood that Doral's internal controls were deficient and its ALLL violated GAAP. Buchert was responsible for preventing the Company from taking these improper actions, which he failed to do.  Thus, Buchert as a member of the Audit Committee and as the designated financial expert, faces a substantial likelihood of liability by this action and is disabled from taking a disinterested view of the claims in this case, and from acting to bring a suit and remedy the wrongs described herein.  According to CW1, Buchert should have been on notice that the quarterly changes to the ALLL methodology were suspect, especially given the troubling circumstances with Doral and in Puerto Rico.

141.    The members of the Audit Committee, Defendants Buchert, Gilleran, and Smith, lack the disinterestedness required to impartially consider a demand by Plaintiffs.  The members of the Audit Committee were responsible for the review with management and the Company's auditor concerning "[m]ajor issues regarding accounting principles and financial statement presentations, including any significant changes in the Corporation's selection or application of accounting principles and major *issues as to the adequacy of the Corporation's internal controls and any special audit steps adopted in light of material control deficiencies."*  Moreover, the Audit Committee was required to receive a quarterly report on any significant deficiency or material weakness in the Corporation's internal controls or any fraud involving an employee associated with internal controls and annually review the Company's disclosure controls and procedures, including the Company's internal controls.  Thus, given that the Company has admitted

to the material weakness in its internal control over financial reporting, that the Company's prior financial statements for the period ending September 30, 2013 required revision, and that the Company was unable to timely file its Form 10-K as a result of the accounting control deficiencies, Defendants Buchert, Gilleran, and Smith face a substantial likelihood of liability by this action and are disabled from taking a disinterested view of the claims in this case, and from acting to bring a suit and remedy the wrongs described herein.

142.    The members of the Board who are also members of the Bank Board, Defendants Gilleran, Buchert, Jacobs, and Wakeman, lack the disinterestedness required to impartially consider a demand by Plaintiffs.  As members of the Bank Board, Defendants Gilleran, Buchert, Jacobs, and Wakeman are specifically bound by the terms of the Consent Agreement.  They were required to increase their oversight and monitoring of Doral Bank's financial reporting and operations, and specifically, reviews of the Bank's internal controls and ALLL.  Thus, given that Doral Bank is the largest division of the Company, that the Company has admitted to the material weakness in its internal control over financial reporting, that the Company's prior financial statements for the period ending September 30, 2013 required revision, and that the Company was unable to timely file its Form 10-K as a result of the accounting control deficiencies, and given their overlapping board directorships, Defendants Gilleran, Buchert, Jacobs, and Wakeman face a substantial likelihood of liability by this action and are disabled from taking a disinterested view of the claims in this case, and from acting to bring a suit and remedy the wrongs described herein.

143.    Each member of the Board lacks the disinterestedness required to impartially consider a demand by Plaintiffs.  As members of the Board, each of the Individual Defendants authorized the execution of, and is bound by the terms of, the Written Agreement.  Pursuant to its terms, they were each required to increase their oversight and monitoring of the Company's financial reporting and operations, and

specifically reviews of the Company's internal controls and ALLL.  Thus, given that the Company has admitted to the material weakness in its internal control over financial reporting, that the Company's prior financial statements for the period ending September 30, 2013 required revision, and that the Company was unable to timely file its Form 10-K as a result of the accounting control deficiencies, each Defendant faces a substantial likelihood of liability by this action and is disabled from performing a disinterested view of the claims in this case and from acting to bring a suit and remedy the wrongs described herein.

### B.      Defendants' Wrongful Acts Are Not Protected by the Business Judgment Rule

144.   Furthermore, pre-suit demand on the Board would have been futile because the wrongs complained of herein were not, and could not have been, an exercise of good faith business judgment.  Making a demand on the Board of Directors is excused if there is reasonable doubt that the challenged transactions were the product of a valid exercise of business judgment and, therefore, are entitled to the protection of the business judgment rule.  To benefit from the protection of the business judgment rule, a director must be informed of all material information reasonably available and, being so informed, the director must act with requisite care in discharging his or her duties.  To meet the standard of care, in light of the information which the Defendants knew, they were obligated to take actions in the best interests of the Company, to the exclusion of their personal pecuniary interests, conduct full and adequate investigation into decisions affecting the Company and its assets, and ensure that the Company was in compliance with applicable laws and regulations.

145.   The Defendants cannot defend their actions by any alleged "independent" business judgment since each of them acted in bad faith, grossly and recklessly abused their discretion, acted in breach of their fiduciary duties to the Company and its stockholders, and failed to act and abdicated their functions and duties as directors.  And,

because the Individual Defendants engaged in acts of misconduct and wrongdoing, as described above, those acts were not the product of a valid exercise of business judgment and not entitled to the protections of the business judgment rule. The Individual Defendants failed to act to protect the interests and business assets of Doral, and failed to ensure that Doral complied with relevant laws and regulations. Failure to take such protections and engagement in egregious unethical conduct could not have been a valid exercise of business judgment.

146. Demand is excused because, as detailed above, Individual Defendants caused, or, through a lack of reasonably prudent oversight, allowed the Company to conclude that its internal control over financial reporting and disclosure controls and procedures were ineffective as of December 31, 2013 and to issue financial statements in violation of GAAP.

147. Accordingly, demanding that the Individual Defendants take action before this lawsuit was filed would have been futile, and therefore, the demand requirement is excused.

## VII.   AIDING AND ABETTING AND CONCERTED ACTION

148. In committing the wrongful acts alleged herein, each Individual Defendant has pursued or joined in the pursuit of a common course of conduct and acted in concert with one another in furtherance of their common plan. In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

149. The purpose and effect of the Individual Defendants' common course of conduct was, among other things, to disguise their violations of law and breaches of fiduciary duty, and to enhance executive and directorial positions and receive substantial compensation and/or fees as a result thereof.

150. The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct. During this time, the Individual Defendants caused

the Company to conceal the true fact that Doral was misrepresenting the financial status of its business and financial results.

151.    The Individual Defendants accomplished their common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently violate state and federal law, the federal securities laws, and abdicate their duties as directors.  Each Individual Defendant was a direct, necessary, and substantial participant in the common enterprise and/or common course of conduct complained of herein.

152.    Each Individual Defendant aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

153.    At all times relevant hereto, each Individual Defendant was an agent of each of the other Individual Defendants and was at all times acting within the course and scope of such agency.

**FIRST CAUSE OF ACTION**
**for Breaches of Fiduciary Duties of Loyalty and Good Faith**
**(Against All Individual Defendants)**

154.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

155.    The Individual Defendants each owed Doral and its shareholders the highest fiduciary duties of loyalty, good faith, and due care in managing and administering the Company's affairs.

156.    The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial affairs of Doral.  By virtue of their duties of loyalty, good faith, and due care:

  
(a)     The Individual Defendants were required to exercise reasonable control and supervision over the Company's officers, employees, agents, business, and operations;

(b)     The Individual Defendants were required to make inquiries, use sound business judgment, and remain informed about Doral's financial performance and operations, and upon receiving notice or information of an imprudent, unsound, or unlawful decision, condition, or practice, the Individual Defendants were required to undertake a reasonable investigation in connection therewith, were required to undertake steps to correct the decision, condition, or practice, and to make public disclosure of such decisions, conditions, or practices in a timely and forthright manner; and

(c)     The Individual Defendants were required to accurately calculate and report to Doral's shareholders the value of the Company's assets.

157.    The Individual Defendants breached their fiduciary duties owed to Doral and its shareholders, or aided and abetted in the breach of other defendants' fiduciary duties, by willfully, recklessly, and intentionally failing to perform their fiduciary duties. They caused the Company to waste valuable assets, unnecessarily expend corporate funds, and failed to properly oversee Doral's business, rendering them personally liable to the Company.

158.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the financial health of the Company and failed to correct those representations.

159.    All Individual Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Company.

160.    The Individual Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their high-level positions in the Company.

161.    As a direct and proximate result of Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, and due care, and aiding and abetting those breaches, as alleged herein, Doral has sustained, and continues to sustain, significant damages and a drastic diminution in value.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

### SECOND CAUSE OF ACTION
#### for Gross Mismanagement
#### (Against All Individual Defendants)

162.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

163.    As detailed more fully herein, the Individual Defendants each owed a duty to Doral and its shareholders to prudently supervise, manage, and control Doral's operations.

164.    The Individual Defendants, by their actions or inactions, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and duties to prudently manage Doral's business and assets.

165.    As such, the Individual Defendants subjected Doral to the unreasonable risk of substantial losses by failing to exercise due care and by failing to use sound business judgment, including their failure to understand and monitor the Company's fiscal and financial performance.  The Individual Defendants breached their duties of due care and diligence in managing and administering Doral's affairs and by failing to prevent a waste of Company assets.

166.    When discharging their duties, the Individual Defendants knew or recklessly disregarded the wrongful conduct described herein, and either approved management's activities or failed to supervise such activities in accordance with their duties.  The Individual Defendants grossly mismanaged or aided and abetted the gross mismanagement of Doral and its assets.

- 55 -

167.    As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of loyalty, good faith, and due care, Doral has sustained damage and continues to sustain significant damages and a drastic diminution in value. As a result of the misconduct alleged herein, all Individual Defendants are liable to the Company.

### THIRD CAUSE OF ACTION
### for Federal Contribution
### (Against All Individual Defendants)

168.    Plaintiffs incorporate by reference all prior paragraphs as if fully set forth herein.

169.    Certain of the Individual Defendants herein have been named as defendants in a securities fraud class action, *In re Doral Financial Corp. Sec. Litig.*, Master File No. 3:14-CV-01393 (GAG) (D. P.R.).

170.    The Individual Defendants had a duty not to defraud the investing public by the dissemination of materially false and misleading press releases and the dissemination of materially false and misleading financial statements.

171.    Although Plaintiffs do not adopt the allegations of wrongdoing that are alleged in the class action as their own, if the Company is deemed to have violated the federal securities laws, and incurs damages therefore, such damages should not be disproportionately borne by the Company, and these Individual Defendants are liable to the Company for contribution pursuant to sections 10(b) and 21(D) of the Exchange Act.

172.    Accordingly, Plaintiffs assert this claim derivatively for contribution, as provided by statute.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment in the Company's favor against the Individual Defendants as follows:

        A.      Determining this action is a proper derivative action, Plaintiffs are adequate representatives on the Company's behalf, and demand is excused;

        B.      Determining the Individual Defendants have breached or aided and abetted the breach of their fiduciary duties to Doral;

        C.      Declaring that the Individual Defendants are obligated to indemnify and hold Doral harmless from any fines, penalties, judgment, settlement, or award pursuant to any of the class actions pending or to be filed against Doral or its employees or agents arising out of the breaches of duty and wrongdoing alleged herein;

        D.      Awarding Doral the damages it sustained due to the violations alleged herein from each of the Individual Defendants jointly and severally, together with interest thereon;

        E.      Awarding Doral exemplary damages in an amount necessary to punish the Individual Defendants and to make an example of the Individual Defendants to the community, according to proof at trial;

        F.      Awarding Doral restitution from each Defendant;

        G.      Ordering all Individual Defendants to return to Doral all incentive-based or equity-based compensation paid to them by the Company during the time they were in breach of their fiduciary duties that they owed to Doral;

        H.      Awarding Doral equitable or injunctive relief as permitted by law;

        I.      Awarding Doral punitive damages;

        J.      Directing Doral to take all necessary actions to reform and improve its corporate governance;

        K.      Awarding pre-judgment and post-judgment interest as allowed by law;

L.      Awarding Plaintiffs the costs and disbursements of this derivative action, including reasonable attorneys' fees, costs, and expenses; and

M.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a trial by jury on all issues.


DATED: 8th day of December, 2014, at San Juan, Puerto Rico

ESPADA, MIÑANA & PEDROSA LAW OFFICES PSC

/s/ Luis E. Miñana
Luis E. Miñana, Esq.
USDC-PR No. 225608
**Espada, Miñana & Pedrosa Law Offices, PSC**
122 Calle Manuel Dómenech Altos
Urb, Baldrich
San Juan, PR  00918
minanalaw@yahoo.com
Tel.:  (787) 758-1999
Fax:  (787) 773-0500
Mob.(787) 402-2226

~and~

Héctor Eduardo Pedrosa-Luna, Esq.
USDC-PR No. 223202
P.O. Box 9023963
San Juan, PR  00902-7511
Tel.:  (787) 920-7983
Fax:  (787) 764-7511

~and~

Eric Quetglas-Jordan
QUETGLAS LAW OFFICES USDC-PR No. 202514
PO Box 16606
San Juan, PR 00908-6606
Tel:  (787) 722-0635/(787) 722-7745
Fax:  (787) 725-3970

~and~

David R. Scott
Joseph P. Guglielmo (*pro hac vice*)
Joseph D. Cohen (*pro hac vice*)
Joseph A. Pettigrew
SCOTT+SCOTT, ATTORNEYS AT LAW,
LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
david.scott@scott-scott.com
jguglielmo@scott-scott.com
jpettigrew@scott-scott.com
Tel.:  (212) 223-6444
Fax:  (212) 223-6334

~and~

Laurence D. Paskowitz, Esq.
Roy L. Jacobs (Of Counsel)
Paskowitz Law Firm P.C.
208 East 51st Street
New York, NY 10022
Telephone: (212) 685-0969
Facsimile: (212) 685-2306

~and~

Beth A. Keller, Esq.
Hynes Keller & Hernandez, LLC
100 South Bedford Road, Suite 340
Mount Kisco, NY 10549
Telephone: (914) 752-3040
Facsimile: (914) 752-3041

*Counsel for Plaintiffs*

## **VERIFICATION**

I, Miguel Rivera, on behalf of Fair View Service Station Inc. ("Fair View), hereby declare and verify that Fair View is currently an owner of Doral Financial Corp. ("Doral" or the "Company") stock and has continuously been an owner of the Company's stock since prior to January 1, 2006. I have read the allegations of the complaint and confirm that this action is not collusive and that I am capable of and willing to fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of the Company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 8th day of December, 2014, at San Juan, Puerto Rico.

_____

Miguel Rivera on behalf of

FAIR VIEW SERVICE STATION, INC.

## VERIFICATION

I, Robert Corwin, hereby declare and verify that I am currently an owner of Doral Financial Corp. ("Doral" or the "Company") stock and have continuously been an owner of the Company's stock since 7/19/2004 I have read the allegations of the complaint and confirm that this action is not collusive and that I am capable of and willing to fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of the Company.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 7 day of December, 2014, at New York, NY.

_Roberta Cown_
Robert Corwin